UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

     v.

CHARLIE VICK,

      Defendant.

Case No.   4:23-CR-40003-MRG

**Guzman, D.J.**

**<u>Memorandum and Order</u>**

## I.   <u>Introduction</u>

A two-count indictment charges Defendant Charlie Vick ("Vick") with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (Count I) and witness tampering in violation of 18 U.S.C. § 1512(b)(1) (Count II). [ECF No. 105]. The indictment also contains a firearm forfeiture allegation. [<u>Id.</u>] Following a seven-day jury trial in January 2024[1] that resulted in this Court declaring a mistrial due to a hung jury [ECF No. 88], Vick has filed two motions to suppress evidence in advance of any potential new trial. [ECF No. 115]; [ECF No. 129].

Vick's first motion aims to suppress statements that he made to police officers on the day of his arrest in the instant case. [ECF No. 115]. His second motion aims to suppress the stop and

---

[1] The indictment-at-issue in the January 2024 trial [ECF No. 1] did not contain the witness tampering charge (Count II) that is contained within the pending, superseding indictment. [ECF No. 105].

subsequent inventory search of the motor vehicle that he had been driving prior to his arrest. [ECF No. 129]. The Government has opposed both of Vick's motions. [ECF No. 128 (opposing ECF No. 115)]; [ECF No. 136 (opposing ECF No. 129)].

After careful consideration of the parties' filings, as well as all of the evidence and argument presented during a lengthy evidentiary hearing held on May 16, 2024 [ECF No. 137], the Court hereby **GRANTS** Vick's motion to suppress statements [ECF No. 115] and the Court also hereby **GRANTS** Vick's second motion as it relates to the purported inventory search. [ECF No. 129]. In support of these rulings, the Court provides its findings of fact and legal analysis below.

## II. **Preliminary Matters**

### a. **No Waiver**

Vick did not move to suppress any evidence prior to his January 2024 trial. However, Vick did timely notify the Court and the Government that he intended to file motions to suppress after this Court's declaration of a mistrial and before the issuance of the superseding indictment. [ECF No. 104]. Neither party briefed the issue of waiver. However, the Court finds that although there is apparently no First Circuit precedent directly on point, the prevailing view amongst other circuits is that the declaration of a mistrial provides all parties with a "clean slate" upon which to assert or waive their rights. See e.g., United States v. Mauskar, 557 F.3d 219, 225 (5th Cir. 2009) (recognizing the "long-established principle" that "[t]he declaration of a mistrial renders nugatory all trial proceedings

2

with the same result as if there had been no trial at all...")
(citations omitted); <u>United States v. Groth</u>, 682 F.2d 578, 580
(6th Cir. 1982) ("We agree with the trial judge...that the
prosecution was not bound by its first waiver. The waiver
referred to the earlier trial...Once a mistrial was declared
each party was free to assert or waive his rights.")
Accordingly, and for the avoidance of any doubt, the Court
concludes that Vick had not waived his rights to assert the
suppression arguments now pending before the Court.

**b. <u>An Evidentiary Hearing Was Warranted</u>**

Criminal defendants do not enjoy a presumptive right to an
evidentiary hearing on motions to suppress.  <u>United States v.
D'Andrea</u>, 648 F.3d 1,5 (1st Cir. 2011).  In order to show
entitlement to such a hearing, a defendant must show "that there
are factual disputes which, if resolved in his favor, would
entitle him to" suppression.  <u>United States v. Staula, 80 F.3d
596, 603 (1st Cir. 1996)</u>.  The Court finds that Vick met his
burden to show entitlement to the evidentiary hearing that was
ultimately held on May 16, 2024.  [ECF No. 137].

Especially since the undersigned served as the trial judge
in this case, the Court was in a unique position to weigh
whether there were meaningful factual disputes regarding the
challenged evidence that justified an evidentiary hearing.  The
case for such a hearing was bolstered by the issues that were
ably raised in the parties' briefing and by the affidavit that
Vick's counsel filed alongside the first suppression motion.
[ECF No. 117].

### c. Types of Evidence Considered

It bears noting at the outset that during a suppression hearing, "apart from questions of privilege, the Federal Rules of Evidence do not apply." United States v. Schaefer, 87 F.3d 562, 570 (1st Cir. 1996) (citations omitted). Therefore, "a judge presiding at a suppression hearing may receive and consider any relevant evidence, including affidavits and unsworn documents that bear indicia of reliability." Id. (citation omitted and emphasis added). It therefore follows that a judge "may receive hearsay evidence at a suppression hearing." Id. (citations omitted).

In accordance with this legal framework, the Court has considered all testimony (including reliable hearsay) that it received from the two witnesses that testified during the suppression hearing[2] -- as well as the eight exhibits that were filed in connection with the suppression motions. Also, where necessary, the Court has considered relevant attorney argument and witness testimony from the January 2024 trial.

### III.   Findings of Fact

#### a. The Rhode Island Arrest Warrant

On February 18, 2023, a woman contacted the North Providence, Rhode Island Police Department and reported that Vick, who was her boyfriend, had allegedly (1) tossed a bucket

---

[2] The two testifying witnesses were Massachusetts State Police ("MSP") Trooper Brendan Andrews ("Trooper Andrews") and Trooper Patrick Dolan ("Trooper Dolan").

4

of bleach on her, and (2) pointed a loaded firearm at her head. According to the alleged victim, these events had occurred on the previous day (i.e., on February 17, 2023).  The alleged victim also reportedly sent these North Providence police officers images of Vick and of what purported to be the firearm that he had pointed at her.  In response, the North Providence Police Department obtained an arrest warrant for Vick -- charging him with (a) domestic assault with a dangerous weapon, (b) domestic failure to relinquish a telephone, (c) domestic simple assault, (d) domestic vandalism, and (d) domestic disorderly conduct.  [ECF No. 128 at 1][3].

### b. Rhode Island Authorities Solicit Assistance from their Massachusetts Counterparts in Arresting Vick

On February 20, 2023, the Rhode Island Violent Fugitive Task Force sought assistance from the MSP's Violent Fugitive Apprehension Section ("MSP VFAS") with arresting Vick, since the former had information that Vick would likely be traveling to his workplace[4] near 583 Quaker Highway in Uxbridge, Massachusetts ("583 Quaker Highway") the following morning (i.e., on February 21, 2023).  [ECF No. 146 at 20].  In turn, MSP VFAS agreed to be part of an apprehension team that would conduct an operation designed to arrest Vick that morning.

Trooper Andrews, one of the MSP VFAS Troopers that was part

---

[3] Throughout, all pincites refer to ECF pagination.

[4] Vick apparently worked for 'Kitchen & Bath Gallery' -- a heating and plumbing supply company.

of the apprehension team tasked with arresting Vick, testified
that prior to the arrest operation, he had been generally
briefed about the underlying allegations pending against Vick.
[ECF No. 146 at 56-57].  Trooper Andrews also testified to
knowing, prior to the arrest operation, that Vick's underlying
allegations included the use of a firearm and also that Vick had
previously been convicted for having possessed firearms and/or
ammunition on a number of occasions.  [Id.]  Relatedly, Trooper
Andrews testified that he had also been given information about
what type of vehicle that Vick was expected to be driving that
morning.  [Id. at 59].  For his part, Trooper Dolan -- who was
also part of the MSP VFAS apprehension team -- testified that he
had been briefed regarding Vick's underlying charges and the
fact that they had involved a firearm [Id. at 21].

### c. **The Apprehension Team Assembles and Arrests Vick Upon His Arrival at the Parking Lot**

Early in the morning of February 21, 2023, a large
apprehension team assembled at 583 Quaker Highway and got into
position to surveil that location's parking lot.  Individuals
from MSP VFAS were part of the apprehension team, but they were
also joined by officers from an unidentified "sheriff's office"
as well as officers and/or state troopers from Rhode Island.
[Id. at 43].  Trooper Dolan estimated that the apprehension team
was comprised of somewhere between eight to fifteen law
enforcement officers.  [Id.]

The apprehension team laid in wait for the vehicle that they

expected Vick to be driving to arrive.[5]  At about 6:53 AM EST,
members of the apprehension team observed a blue-colored Nissan
Altima, the vehicle that they expected Vick to be driving, pull
into the 583 Quaker Highway parking lot.  [ECF No. 136 at 2].
After sitting in the vehicle for about fifteen minutes, Vick
exited his vehicle and started to walk towards his workplace.
[ECF No. 146 at 42].  At this point, the apprehension team
quickly approached Vick and handcuffed him.

### d. The Apprehension Team's Post-Arrest Exchange with Vick in the Parking Lot

Around the same time that Vick was placed in handcuffs,
certain members of the apprehension team activated their body-
worn cameras.[6]  During the minutes that followed his arrest,

---

[5] The Nissan Altima that Vick drove to work on the day of his
arrest plays a central role in the factual background.  At
trial, Vick's uncle -- Mr. Jamie Warner ("Warner") testified
that the 2013 model vehicle belonged to him -- and that he came
to own it after his girlfriend had "left" it to him upon their
separation.  [ECF No. 136-1 at 8].  Vick was living with Warner
at the time of his arrest and the Nissan Altima had been kept at
their shared address in Rhode Island.  [Id. at 6; 9].  Warner
stated that he had one set of car keys, which he kept in his
home's kitchen area.  [Id. at 10-11].  He further testified that
he had been lending the vehicle to Vick for some "weeks" and
that Vick had used the vehicle "multiple times."  [Id. at 10].
Warner had also testified that although he did not recall
lending the vehicle to Vick on the particular day of Vick's
arrest (i.e., February 21, 2023), he would have had no problem
if Vick had borrowed the vehicle.  [Id. at 11 (Warner testifying
that Vick borrowing the vehicle "would have been okay with me
because I knew he was probably going to work, doing something
productive.")]  Warner had further testified that he would also
lend the vehicle to other people, such as "family members, [and]
friends" in addition to Vick.  [Id. at 43].

[6] The audio and video footage from Trooper Andrews' body camera
can be found at Exhibit A and Exhibit A-1 contains a written

members of the apprehension team engaged in an audio and video recorded encounter with Vick prior to his being transported to the Millbury, Massachusetts MSP Barracks where the booking process began.  It is undisputed that Vick was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966) prior to or during this audio and video recorded encounter in the 583 Quaker Highway parking lot.[7]

Moments after handcuffing Vick, members of the apprehension team conducted a pat frisk.  [ECF No. 128 at 2].  Vick inquired several times as to why he was being arrested.  [Ex. A-1, at 1-3].  Members of the apprehension team informed Vick that another agency had a warrant out for his arrest but did not provide any details about the underlying charges.  [Id.]

Notably, members of the apprehension team asked Vick *repeatedly* about whether he had car keys on his person and about what type of vehicle he was driving.  [Id. at 1-2].  For example, shortly after Trooper Andrews' body camera activated, Trooper Dolan asked Vick, "You got your car[] keys?" [Id. at 1].  After Vick denied having car keys, an officer/Trooper named "Johnson" asked Vick, "How did you get here?" [Id. at 1].  Although Vick initially said that a friend had given him a ride [Id. at 1], officer/Trooper Johnson continued to press the issue, saying "Really?" twice in response to Vick's answer.

transcript of the audio portion of this footage.

---

[7] ECF No. 146 at 69 (Counsel for the Government stating at the suppression hearing that, "[t]here's no contest that [Vick] was under arrest or that he wasn't advised of his rights pursuant to Miranda...").

[Id. at 1-2].  Moments later, Trooper Andrews again began inquiring about Vick's vehicle, asking, "What car you driving?" [Id. at 2].  Vick again replied that that he had not been driving. [Id.]  Trooper Karlon then immediately asked Vick the same question, "You're not driving[?]" [Id.]  Vick replied "Naw[...]no" [Id.]

A few moments later, Vick asked if his work supervisor could call a man later identified as Warner [ECF No. 136 at 2-3] to come and retrieve "his [Warner's] vehicle."  [Ex. A-1, at 4]. After it became clear that Vick *did* have the keys to the Nissan Altima on his person, Vick asked the apprehension team if they could "give [his] boss...[his] car keys."  [Id.]  The apprehension team did ultimately honor this request, while at the same time continuing to probe about the vehicle. Specifically, Sergeant Martinez asked Vick if he could "throw [Vick's] knife in the car."  [Id.] Vick unequivocally said "NO" in response to this question and instead asked if the apprehension team could give his personal effects to his supervisor for safekeeping. [Id.] The apprehension team honored Vick's request not to put his items in the Nissan Altima.

While Vick was in handcuffs, Trooper Dolan conducted a "plain view" search of the Nissan Altima but did not discover any contraband during this search.  [ECF No. 146 at 24]; [Ex. F].  Trooper Dolan's body worn camera footage from the moments following this plain view search appears to contain some law enforcement officer saying "...once we get in the car..."  [Ex.

F].  This same voice then requests that the nearby body worn camera footage be "mute[d]" for a second..." which Trooper Dolan then did, leading to a few seconds of silence in the footage coupled with Trooper Dolan appearing to place his hand over the camera.  [Id.]

In this connection, it is also worth noting that the Government signaled at the suppression hearing that, based on the information that the members of the apprehension team had at the time of Vick's arrest, they likely could not have obtained a search warrant for the vehicle.  [ECF No. 146 at 10 (counsel for the Government stating in response to a question from the Court: "I don't think that based on what they knew at the time they effected the arrest they could have obtained a search warrant for the car, nor was that their role that day.")].

At approximately 7:05 AM EST, Vick was transported to the MSP barracks in Millbury, Massachusetts.  [ECF No. 128 at 2].  The Court takes judicial notice of the fact that 583 Quaker Highway is about 16.1 miles of driving distance away from these barracks.[8]  Trooper Andrews stated that the driving time between these two locations is about "20 minutes to a half hour."  [ECF

_____

[8] The distance here was calculated using Google Maps. Rindfleisch v. Gentiva Health Sys., 752 F. Supp. 2d 246, 259, n. 13 (E.D.N.Y. 2010) (collecting cases and observing that, "[c]ourts commonly use internet mapping tools to take judicial notice of distance and geography.")

No. 146 at 62].

###### e. **Sergeant Martinez Orders MSP VFAS Troopers to Return to 583 Quaker Highway to Await Warner's Retrieval of the Nissan Altima**

Shortly after arriving at the Millbury, Massachusetts MSP barracks following Vick's arrest, members of the apprehension team began the booking and report-writing process. [ECF No. 146 at 59 (Trooper Andrews testifying that, "[a]fter Mr. Vick was transported back to the Millbury barracks, we went back to the (sic) booking process and also to do the reports.")]. At this time, MSP VFAS team members discovered that the Nissan Altima that Vick had been driving was allegedly unregistered, had wrongfully attached plates, and was also uninsured. [Id.] Trooper Andrews, who had been involved with searching for information about the vehicle, testified that while he was at the MSP barracks, he was unsure about who owned the Nissan Altima. [ECF No. 146 at 62-63].

At around this time, Sergeant Martinez told Trooper Andrews that Vick's uncle would be returning to pick up the vehicle at Vick's direction. [Id.] Sergeant Martinez knew that Warner would likely be coming to pick up the vehicle because he knew that Vick had passed this request along to his uncle moments after his arrest. [Id. at 30]. Although the safe apprehension of Vick was complete at that this time, Sergeant Martinez ordered Trooper Andrews to return to 583 Quaker Highway in order to surveil the Nissan Altima. [Id.at 65]. Separately, Sergeant Martinez also directed Trooper Dolan to perform the same task in his vehicle. [Id. at 28]. Trooper Dolan testified that he

11

returned to 583 Quaker Highway at approximately 9:30 AM EST. [Id. at 60].

The MSP VFAS Troopers had been given a brief description of Warner and had also learned that he did not possess valid driver's license.  [Id. at 31-32].  Trooper Andrews and Trooper Dolan both waited in their vehicles in the 583 Quaker Highway parking lot for at least an hour and a half[9] before a man later identified as Warner finally arrived in a white vehicle.  [Id. at 29; 31].

### f. MSP VFAS Members Stop the Nissan Altima Upon Its Entry onto a Public Way; Issue Summons to Warner

At trial, Warner had testified that the white vehicle that transported him to 583 Uxbridge Highway belonged to his nephew "Daryl" and that Daryl had driven Warner and Warner's young son "Anthony"[10] to the location in order to retrieve the Nissan Altima after receiving a phone call from Vick's supervisor earlier that morning.  [ECF No. 136-1 at 14].  The MSP VFAS

---

[9] It is not exactly clear how long the MSP VFAS Troopers waited in the 583 Uxbridge Highway parking lot once they had returned from the barracks.  In its briefing, counsel for the Government stated that the MSP VFAS team members returned to the 583 Uxbridge Highway parking at "approximately 9:30 [AM EST]" and that Warner eventually drove the Nissan Altima away at 11:00 AM EST.  [ECF No. 128 at 6].

Trooper Andrews was not sure exactly how much time he and other MSP VFAS team members had spent waiting for Warner, but he did state that Warner ultimately arrived "several hours" after Vick's arrest.  [ECF No. 146 at 30-31].

[10] Although the Court does not know Anthony's exact age on the day in question, it notes that Trooper Dolan testified that he appeared to be under the age of ten and about four feet tall. [ECF No. 146 at 51].

Troopers testified that they had observed the man later identified as Warner exit from the passenger side of the white vehicle.  [ECF No. 146 at 31; 64].

Upon arrival, Warner went into Vick's workplace and then returned and unlocked the Nissan Altima.  [Id. at 31-32]. Warner testified at trial that when he approached the Nissan Altima, the only item that he had in his hands were the keys that he had just retrieved.  [ECF No. 136-1 at 47].  Warner also testified at trial that he had first opened one of the vehicle's back doors to allow Anthony to enter before personally entering the driver's seat.  [ECF No. 136-1 at 47-48].

Before driving the vehicle, Warner bundled up and removed a black colored jacket from the vehicle's backseat -- which he thought *might* have contained a separate item within it (although he did not check) -- and then "stuffed" the bundled jacket into an unzipped backpack that was already in the trunk.  [Id. at 49-50].  Trooper Dolan and Trooper Andrews each testified at the suppression hearing that they had observed Warner move such an object into the trunk before driving the vehicle.  [ECF No. 146 at 39; 64].

Once Warner was back in the driver's seat, he started the Nissan Altima and drove across the parking lot towards the exit. The Troopers observed the vehicle driving across the parking lot.  Trooper Dolan testified that he knew that Anthony was in the vehicle as it began to move.  [Id. at 52].  Both Trooper Dolan and Trooper Andrews testified that they could have, but chose not to, stop the vehicle while it was still in the parking

lot.  [Id. at 35; 65].

Once the Nissan Altima entered Quaker Highway -- *a public way* -- the Troopers exited the parking lot, followed the Nissan Altima for a short distance, and then initiated a motor vehicle stop on the Nissan Altima "within a mile" from 583 Quaker Highway.  [Id. at 33].

During this motor vehicle stop, the responding MSP VFAS team members[11] directed Warner to step out of the Nissan Altima and they informed him that the vehicle was unregistered and uninsured.  [ECF No. 136-1 at 20].  They also informed him that he would be issued a summons for driving without a license and that the vehicle would be towed.  [ECF No. 146 at 33]; [ECF No. 136-1 at 20].  Warner knew that he was not being arrested at that time.  [ECF No. 136-1 at 20].

The responding MSP VFAS team members did not inform Warner that he could take any personal items with him nor did they give him the opportunity to have a properly licensed third-party come and pick up the vehicle.  Relatedly, the responding MSP VFAS team members did not ask Warner for his preference in towing company or roadside service company.  Warner removed Anthony and his cell phone from the vehicle and was allowed to walk back in the direction of the white vehicle driven by Daryl; who in turn drove the father and son away from the scene.  [Id.]

---

[11] The Court notes that other members of the MSP VFAS team (including, at least, Sergeant Martinez and Trooper Erik Karlon ("Trooper Karlon")) were also on scene for the motor vehicle stop and the subsequent, purported inventory search.  [ECF No. 146 at 45-46].  The Court does not know when they had returned to the area near 583 Quaker Highway.

### g. **The Purported Inventory Search**

Shortly after Warner and Anthony vacated the Nissan Altima, a tow truck was called.  [ECF No. 146 at 61].  Then, three members of the MSP VFAS team (including at least Trooper Dolan, Sergeant Martinez, and Trooper Karlon) walked towards the Nissan Altima to begin a purported inventory search.  As Sergeant Martinez walked towards the front passenger side door and Trooper Karlon walked towards the rear passenger door, Trooper Dolan initiated the purported inventory search by first opening the trunk and then immediately reaching for the backpack into which he had just seen Warner stuff the black jacket that had previously been in the backseat.  [ECF No. 146 at 39].[12]  Once Trooper Dolan unwrapped the black jacket, he discovered the firearm that forms the basis for the pending felon in possession charge (i.e., Count I) against Vick.  [Id.]  Once the firearm was discovered, the purported inventory search "paused."  [Id. at 46].  Sergeant Martinez then ordered Trooper Dolan to try to locate the white vehicle being driven by Daryl, however the search for that vehicle proved unsuccessful.  [Id.]  Trooper Dolan, who had begun the inventory search, testified that after he found the firearm, he personally did not engage any further with the vehicle.  [Id. at 47].  According to Trooper Andrews, Sergeant Martinez completed the list of inventoried items -- which is contained in Exhibit E.  [Id. at 61].

---

[12] Exhibit G contains a portion of Trooper Dolan's body camera footage from the purported inventory search.

**h. The MSP's "Towing" and "Vehicle Inventory" Policies**

The operative MSP "Vehicle Inventory" and "Towing" policies were submitted as Exhibits B and C, respectively.  Although the Court will not recite every important provision contained therein, it will point out a few salient elements of each document.

With respect to the "Towing" policy, the document's first sentence makes clear that "[p]ublic safety is the Department's primary concern and shall guide the application of this policy..." [Ex. B, at 1] (emphasis added).  Moreover, a vehicle being "[n]ot validly registered or insured in violation of law" is one of the possible "[c]auses for [r]emoval."  [Id. at 2]. Relative to the responsibilities incumbent on an MSP member towing a vehicle, the "Towing" policy provides, in part, that:

> [p]rior to notifying the tow company, members shall inquire whether the owner or authorized driver can direct the member to dispose of the vehicle in some lawful and reasonable manner, unless the operator has refused a breathalyzer test, in which case the vehicle shall be impounded for a minimum of 12 hours. Members shall also inquire if there is a preference for a particular tow company or roadside service organization.

> [Id. at 3] (emphasis in original).

With respect to the "Vehicle Inventory" policy, its stated purpose is to protect "[t]he vehicle and its contents; [t]he [MSP] and tow company against claims of lost, stolen, or vandalized property; and [t]he [MSP] member(s) and the public from dangerous items that might be in the vehicle."  [Ex. C, at

16

1].  Importantly, the policy provides that taking an inventory is "[n]ot [n]ecessary" when, among other things, the vehicle is "[r]emoved by a third party as outlined in [the Towing Policy]..."  [Id.]  In terms of the required inventory procedure, the policy provides in part that "[t]he standard inventory procedure shall consist of a <u>detailed inspection of the interior and exterior of the vehicle for damaged and missing parts</u>, as well as to locate and record the contents of the vehicle..."  [Id. at 2] (emphasis added).  The policy is silent on whether the MSP member conducting the inventory needs to inform an occupant of a towed vehicle that they may remove or entrust their possessions to another person, but the policy does provide that if such a request is made, the request may be granted unless it would impede the towing / impoundment process and/or the MSP member "has probable cause to seize the items." [Id.]  In terms of "[r]esponsibilities" incumbent upon MSP members, one notable requirement is that they must "[a]ccurately record on the motor vehicle inventory form a complete listing of the general condition of the vehicle and its contents..."  [Id.]

IV.  <u>**Vick's Motion to Suppress Statements [ECF No. 115]**</u>

With his first suppression motion, Vick contends that "all statements" that he made to members of the apprehension team in the 583 Quaker Highway parking lot must be suppressed on the grounds that this (audio and video recorded) encounter

constituted an unconstitutional, pre-Miranda custodial interrogation.  [ECF No. 115 at 5].  Specifically, Vick has alleged that the challenged questioning violated his rights under the Fourth, Fifth, and Fourteenth Amendments.  [Id. at 1].  The Court finds that this particular motion most directly implicates Vick's Fifth Amendment rights.

The Fifth Amendment provides, in relevant part, that "no person shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  It is undisputed that Vick has Fifth Amendment "standing" to pursue this motion.  See e.g., United States v. Katrell Young, 2024 U.S. Dist. LEXIS 36922, *16-17 (D. Minn., Mar. 4, 2024) (adopted by United States v. Katrell Young, 2024 U.S. Dist. LEXIS 90708 (D. Minn., May 21, 2024) (stating the rule that "[a] defendant may seek to suppress his own involuntary statements based on his Fifth Amendment right against self-incrimination") (citation omitted and emphasis added).

### a. Legal Standard -- *Miranda* Warnings

It is axiomatic that prior to a custodial interrogation, police must inform a person of their Miranda rights.  Miranda, 384 U.S. at 478-479; United States v. Guerrier, 669 F.3d 1, 5 (1st Cir. 2011).  Specifically, law enforcement officers must inform the individual that: (1) they have a right to remain silent; (2) that their statements may be used as evidence against them; (3) that they have a right to the presence of an attorney, and(4) that if they cannot afford an attorney, one will be appointed to represent them.  Miranda, 384 U.S. at 479;

18

see also United States v. Monson, 72 F.4th 1, 10 (1st Cir. 2023).

Both elements -- "custody" and "interrogation" -- must be present for Miranda warnings to be required. United States v. Molina-Gómez, 781 F.3d 13, 21-22 (1st Cir. 2015). When, as here, a defendant has alleged custodial interrogation, the burden is on the Government to "prove that no custodial interrogation took place, some exception to Miranda is applicable, or that [the defendant] was properly Mirandized and waived his rights." United States v. Gunning, 405 F. Supp. 2d 79, 83-84 (D. Mass. Dec. 13, 2005).

Custody exists when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Molina-Gómez, 781 F.3d at 22. The custody test "is not applied mechanically, but in view of the totality of the circumstances." United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir. 1998).

The other half of the equation -- interrogation -- consists of "either express questioning or its functional equivalent." United States v. Corleto, 56 F.4th 169, 178 (1st Cir. 2022) (citing Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980). "The 'functional equivalent' of questioning means 'any words or action on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Id. (omission in original) (quoting Innis, 446 U.S. at 301). An incriminating response is "any response -- whether inculpatory or exculpatory--that the prosecution may

seek to introduce at trial." _Innis_, 446 U.S. at 301, n. 5
(emphasis in original).  It is also true that police may not be
"held accountable for the unforeseeable results of their words
or actions..." and that "as conceptualized in the _Miranda_
opinion, [interrogation] must reflect a measure of compulsion
above and beyond that inherent in custody itself." _Id._ at 300-
302.

Even when a _Miranda_ warning is not given, "[v]olunteered
statements of any kind are not barred." _Miranda_, 384 U.S. at
478.  Moreover, the "mere fact that a police officer may be
aware that there is a possibility that a suspect may make an
incriminating statement is insufficient to establish the
functional equivalent of interrogation." _Davis_, 773 F3d at 339
(citation omitted). Just as with the custody inquiry, the Court
must consider the totality of the circumstances when determining
whether an interrogation occurred.  _Id._ at 338.  _Innis_ teaches
that the interrogation analysis focuses "primarily upon the
perceptions of the suspect, rather than the intent of the
police."  446 U.S. at 301.  Importantly, though, the _Innis_ Court
also explained that the intent of the police was not irrelevant
and that the police's intent "may well have a bearing on whether
the police should have known that their words or actions were
reasonably likely to evoke an incriminating response..."  _Id._,
n. 7.

An exception to the general bar against interrogation
exists for "routine booking questions" seeking basic background
information -- such as the "suspect's name, address, and related

20

matters." See United States v. Sanchez, 817 F.3d 38, 44-45 (1st
Cir. 2016) (citations omitted).  The so-called "booking
exception" exists as a recognition of the fact that such routine
questions "rarely elicit an incriminating response – even when
asked after an arrest," (Id (citations and internal quotation
marks omitted)) and that they also serve a "legitimate
administrative need." United States v. Doe, 878 F.2d 1546, 1551
(1st Cir. 1989).  For example, the First Circuit has found that
such routine questions include, at least, "name, date of birth,
and Social Security number" (United States v. Reyes, 225 F.3d
71, 77) and that "employment questions" can also fall within the
booking exception depending on the circumstances (Sanchez, 817
F.3d at 45-46).  The Government carries the burden of showing
that the booking exception applies.  United States v. Stroman,
2006 U.S. Dist. LEXIS 870, *52 (D. Me. Jan. 9, 2006).

As the First Circuit has recognized, though, "there is an
exception to this exception" -- namely that "the booking
exception does not apply 'where the law enforcement officer, in
the guise of asking for background information, seeks to elicit
information that may incriminate.'" Sanchez, 817 F.3d at 44-45
(citation omitted and emphasis added).  The First Circuit has
also explained that whether a given question is covered by the
booking exception can turn, in part, on the types of underlying
charges-at-issue.  Reyes, 225 F.3d at 77 (reasoning that, in
certain problematic scenarios that the Court conjured up, "the
requested information [would be] so clearly and directly linked
to the suspected offense that we would expect a reasonable

21

officer to foresee that his questions might elicit an incriminating response from the individual being questioned....")  Ultimately, whether the booking exception applies in a particular case, "turns on an 'objective' test that asks 'whether the questions and circumstances were such that the officer should have reasonably expected the questions to elicit an incriminating response...meaning 'the officer's <u>actual</u> belief or intent,' though 'relevant,' is in no way 'conclusive.'" <u>Sanchez</u>, 817 F.3d at 45 (citations omitted).

### b. **Application -- Custody**

It is undisputed that Vick was not advised of his <u>Miranda</u> rights prior to the challenged questioning.  To determine whether <u>Miranda</u> warnings were required before the apprehension team put its questions to Vick, the first question is whether the custody element is satisfied.  Notably, both parties agree that it is.  [ECF No. 116, at 3]; [ECF No. 128, at 3].  Indeed, Vick was placed under formal arrest almost immediately upon exiting the Nissan Altima; with the apprehension team both informing him that they had a warrant for his arrest and placing him in handcuffs.[13]  Moreover, a good portion of his exchanges with members of the apprehension team occurred while he was seated in the back of a police cruiser.  [Ex. A].  Thus, based on the totality of the circumstances, the Court easily concludes

---

[13] Since a "formal arrest" undisputedly occurred here, the Court need not engage in the First Circuit's two-step inquiry that would otherwise be required as part of the custody analysis. See e.g., <u>United States v. Hughes</u>, 640 F.3d 428, 435 (1st Cir. 2011) (articulating the two-step inquiry that courts must ordinarily apply in the absence of a formal arrest.)

that Vick was in custody at the time of the challenged questioning.  See e.g., United States v. Cadieux, 2004 U.S. Dist. LEXIS 1403, *8-9 (D. Me. Feb. 3, 2004) ("[t]hat the defendant was in custody appears obvious.  He was handcuffed and restrained to the degree associated with a formal arrest.")

### c. **Application -- Interrogation**

Since the Court has found that Vick was in custody, it must next determine whether the apprehension team members' questioning of Vick constituted an interrogation.  This is a disputed matter -- Vick maintains that the challenged questioning did constitute interrogation. [ECF No. 116 at 3-5]. The Government, for its part, does not dispute that Vick was asked questions, but has instead principally argued that the questions posed fell within the above-described "booking exception" such that the Miranda warnings were not required. [ECF No. 128 at 3-5].

Here, under the totality of the circumstances, the various members of the apprehension team's pre-Miranda questioning of Vick did constitute an interrogation.  According to Innis, resolving whether police should have known that their questioning was reasonably likely to elicit an incriminating response from a suspect turns "primarily upon the perceptions of the suspect, rather than the intent of the police."  446 U.S. at 301.  Therefore, the Court will begin its analysis from Vick's perspective and dedicate most of its focus there before considering the intent of the apprehension team members, which is also a valid consideration under Innis.  Id., n. 7.

23

Case 4:23-cr-40003-MRG   Document 157   Filed 07/01/24   Page 24 of 49

The challenged questioning began shortly after Vick was suddenly surrounded by eight to fifteen tactical police officers and placed under arrest right upon arriving at his workplace early in the morning.  Once the body camera audio and video footage began, Vick could be heard pleading with the apprehension team for information about why he had just been arrested.  During a recorded interaction that lasted only a few minutes, members of the apprehension team asked Vick at least seven times about how he got to work that day, what kind of vehicle he was driving, and about his car keys.  [Ex. A-1 at 1-5].  Specifically, and in sequential order, they asked the following:

- Question 1: Trooper Dolan asked Vick: "You got your car[] keys?"

- Questions 2,3,4: Trooper/Officer Johnson asked Vick "How did you get here?" and, after Vick said that a friend gave him a ride, Johnson pressed the issue, asking "Really?" twice

- Question 5: Trooper Andrews asked Vick, "What car you driving?"

- Question 6: Trooper Karlon asked Vick, "You're not driving[?]"

- Question 7: Sergeant Martinez asked Vick whether it was "alright for [him] to throw [Vick's] knife in the car?"

[Id.]

Although Vick was not immediately honest about how he had

24

gotten to work that day -- which explains *some* of the follow-up
questions -- a suspect in Vick's shoes would quickly perceive
that the apprehension team was *intensely focused* on his vehicle.

In response, the Government argues that the challenged
questioning falls squarely within the booking exception.  In the
Government's words,

> "the questions posed by the troopers regarding his
> keys- and later the knife in his pocket- were not such
> that the police should have known were reasonably
> likely to elicit an incriminating response from the
> defendant. As is borne out by the full interaction, a
> reasonable person would have understood the purpose of
> discussing the keys and knife was to allow the
> defendant to express his wishes about the treatment of
> his personal property. . ."

[ECF No. 128 at 4].

The Court finds that the Government has failed to carry its
burden of showing that the booking exception applies for three
principal reasons -- none of which are dispositive on their own.
First, it bears mentioning that Vick was not actually being
booked when the challenged questions were asked.  In fact,
Trooper Andrews testified that the booking process did not begin
until after Vick arrived at the Millbury MSP barracks.  [ECF No.
146 at 59].  This fact serves to undermine the claim that the
questioning was for a booking purpose.

Second, although the Government cites prior cases where
questions about vehicles and items commonly kept in one's
pockets were found to be constitutionally innocuous [ECF No. 128
at 4-5], it is not always the case that a given topic fits into
the booking exception. The overall context matters

25

significantly.  The First Circuit's decision in <u>Reyes</u> is
particularly instructive on this point.  225 F.3d at 77.

    Here, Vick was charged with, among other things, "domestic
assault <u>with a dangerous weapon</u>," to wit, a firearm.  [ECF No.
128 at 1] (emphasis added).  Therefore, in this context, the
members of the apprehension team should have known that
repeatedly questioning Vick about the status of his vehicle (a
place where he might reasonably have been keeping certain items)
was reasonably likely to elicit an incriminating response from
him.  Relatedly, it is unclear that there was a "legitimate
administrative need" for the police to be so concerned about the
Nissan Altima.  <u>See</u> <u>Doe</u>, 878 F.2d at 1551.  The vehicle was
parked safely on private property, and at the time of the
questioning, the apprehension team did not have any reason to
believe it posed a public safety risk or that it was somehow
part of a criminal investigation.

    Third and finally, the Government's argument fails to
consider the significance of the fact that the apprehension team
members were *repeatedly and persistently* asking the same
supposedly "routine" questions. As other federal courts have
recognized, repeatedly and persistently asking the same
questions can lead to a finding that the booking exception has
been breached.  For example, the Fifth Circuit in <u>United States</u>
<u>v. Virgen-Moreno</u>, 265 F.3d 276, 294 (5th Cir. 2001) held that
repeatedly asking a suspect whether he resided at a certain
address exceeded the bounds of the booking exception.  Similarly
instructive is a 2019 decision from the Northern District of

26

Georgia.  United States v. Mitchell, 2019 U.S. Dist. LEXIS
139026, *51-52 (N.D. Ga. June 24, 2019), (R&R adopted by United
States v. Mitchell, 2019 U.S. Dist. LEXIS 138799 (N.D. Ga. Aug.
16, 2019) ("[t]hough it may have been constitutionally
permissible for the officers to ask Mitchell for his full name,
birth date, and identification under the booking exception, the
officers' subsequent follow up questions about his name, his
birth date, whether he smokes or drinks, how he buys tobacco
products (without identification) were designed to catch
Mitchell in deception about previously given answers or spur
Mitchell to correct the deception, and thus, the questioning
became investigatory.") (citations omitted and emphasis added).
A final instructive example is found in a 1998 decision from the
Kansas District Court.  United States v. Villota-Gomez, 994 F.
Supp. 1322, 1334-1335 (D. Kan. Jan. 21, 1998) (finding that a
law enforcement officer's decision to "press[] the matter" of
whether the suspect had given a false identify "crossed the
bounds of 'routine' or 'basic' booking procedures") (emphasis
added).

     In this case, the apprehension team members' decision to
repeatedly "press[] the matter[s]" concerning Vick's vehicle and
car keys similarly "crossed the bounds" of what *might* have been
considered routine booking questions; rendering the questioning
investigatory in nature. See e.g., Virgen-Moreno, 265 F.3d at
294; Mitchell, 2019 U.S. Dist. LEXIS 139026, *51-52; Villota-
Gomez, 994 F. Supp. At 1334-1335.

     The evidence that the apprehension team's questioning of

27

Vick constituted an interrogation becomes clearer when
considering the likely intent of the apprehension team members.
See Innis, 446 U.S. at 301, n. 7 (noting that the intent of the
police, "may well have a bearing on whether [they] should have
known that their words or actions were reasonably likely to
evoke an incriminating response.")

The apprehension team was aware that Vick's pending charges
involved the possession and wrongful use of a firearm.
Compounding this, the alleged victim had sent photos of a
firearm purportedly possessed by Vick to Rhode Island
authorities.  Trooper Dolan's testimony revealed that some Rhode
Island law enforcement officials were actually part of the
apprehension team [ECF No. 146 at 49] – establishing a direct
connection between the agency or agencies investigating the
charges and the apprehension team assembled on February 21,
2023.  Moreover, Trooper Andrews and Trooper Dolan each
acknowledged they were briefed about allegations against Vick.
[ECF No. 146 at 21; 56-57].

Given this background, and following the guidance from
Reyes, which suggests that the charges-at-issue are relevant to
determining whether an interrogation occurred, the Court finds
that the apprehension team shared an intent to, somewhat
understandably, determine whether Vick possessed a firearm on
his person and/or in his vehicle.  The Court finds, however,
that this intent likely drove their pre-Miranda questioning;
supporting the conclusion that an interrogation occurred.

In sum and based on the totality of the circumstances, the

Court concludes (1) that the challenged questioning constituted an interrogation and that (2) the booking exception does not apply. <u>Sanchez</u>, 817 F.3d at 44-45.

### d. <u>Conclusion & Suppression Decision</u>

Since the Court has concluded that Vick was subjected to a custodial interrogation prior to being given his <u>Miranda</u> rights and that the booking exception does not apply, it must now decide what exactly must be suppressed.  Since the challenged questioning all occurred within a very short period time (a few minutes) and all within one continuous exchange, any statements that Vick made in response to questioning before he was apprised of his rights must be suppressed.  <u>See e.g.,</u> <u>Miranda</u>, 384 U.S. at 479; <u>United States v. Rang</u>, 2017 U.S. Dist. LEXIS 2184, *7 (D. Mass. Jan. 6, 2017) (reviewing a recorded interaction and suppressing "<u>any statements</u> [that the defendant] made in response to questioning before he was apprised of his rights...) (emphasis added); <u>United States v. McRae</u>, 202 U.S. Dist. LEXIS 26680, *17-18 (S.D. Ga. Jan. 23, 2020) ("The Court will not undertake a detailed analysis of the entire exchange, but instead finds suppression is warranted for any statement – whether 'inculpatory or exculpatory – that the <u>prosecution</u> may seek to introduce at trial.'" (quoting <u>Innis</u>, 446 U.S. at 301-302, n. 5 (emphasis in original)).

### V.  <u>Vick's Motion to Suppress the Stop and Search of the Nissan Altima [ECF No. 129]</u>

With his second suppression motion, Vick argues that the Court should suppress "any and all items seized pursuant to a

stop and seizure" of the Nissan Altima that he was driving prior to his arrest.  [ECF No. 129 at 1].  This particular motion implicates Vick's rights under the Fourth Amendment -- although a threshold and disputed issue is whether Vick has Fourth Amendment "standing" to even pursue the arguments contained within this motion.  In relevant part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, hours, papers, and effects, against unreasonable search and seizures, shall not be violated..." U.S. Const. amend. IV.

a. **Legal Standard -- Fourth Amendment "Standing"**

It is black letter law that Fourth Amendment rights are "personal rights which...may not be vicariously asserted."  See e.g., United States v. Cardona-Sandoval, 6 F.3d 15, 21 (1st Cir. 1993) (citation omitted).  The question of whether one has the "capacity to claim the protection of the Fourth Amendment depends...on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy."  United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016) (citation omitted).

The Supreme Court has made clear that resolving this particular threshold issue is not really one of *standing* (in the sense of Article III standing) but is "more properly placed within the purview of substantive Fourth Amendment law." Minnesota v. Carter, 525 U.S. 87, 88 (1998) (citation omitted). Nevertheless, as the First Circuit has observed, "courts continue to refer to it as an issue of 'standing.'" United

States v. Lipscomb, 539 F.3d 32, 36 (1st Cir. 2008).[14]

The burden of establishing Fourth Amendment "standing" falls on the defendant -- and a court may not proceed with any Fourth Amendment analysis unless and until that burden is met. United States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994) (citations omitted).  To be more specific about the defendant's burden, a defendant seeking to invoke Fourth Amendment "standing" must show "a reasonable expectation of privacy in the area searched and in relation to the items seized." United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).

The Aguirre Court made clear that although "[n]o bright line rule" controls the issue of whether a person has a reasonable expectation of privacy in a vehicle, the following factors are nevertheless relevant:

> "[1] ownership, [2] possession and/or control; [3] historical use of the property searched or the thing seized; [4] ability to regulate access; [5] the totality of the surrounding circumstances; [6] existence or nonexistence of a subjective anticipation of privacy; [7] and the objective reasonableness of such an expectancy under the facts of a given case."
>
> Id. at 856-857.

At a more theoretical level, the Court must look to whether "the defendant thought of the article that was searched 'as a

---

[14] Accordingly, the Court will use the term "standing" in quotation marks as a reflection of that term's imperfect nature in this context.  See e.g., United States v. Sanchez, 943 F.2d 110, 113, n. 1 (1st Cir. 1991) ("We therefore use the term 'standing' somewhat imprecisely to refer to this threshold substantive determination.")

private one, and treated it as such.'" <u>United States of Am. v.</u> <u>Bates</u>, 100 F. Supp. 3d 77, 83 (D. Mass. Apr. 24. 2015) (citation omitted).  As another session of this Court has noted, "[t]he <u>Aguirre</u> factors provide a framework...but 'no single factor determines whether an individual' has a protected Fourth Amendment expectation of privacy." <u>Id.</u>

A few final observations regarding the legal standard that are particularly relevant in this case.  First, the Supreme Court has rejected the proposition that merely being the "target" of an investigation automatically confers Fourth Amendment "standing." <u>Rakas v. Illinois</u>, 439 U.S. 128, 134 (1978) (explaining that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed").

Second, in <u>United States v. Almeida</u>, the First Circuit noted: (1) that "in the context of a vehicle search, a defendant must show a 'property [or] a possessory interest in the automobile' in order to establish a reasonable expectation of privacy"; (2) that, "in some circumstances, a person who borrows a vehicle with the owner's permission may have a reasonable expectation of privacy"; and that (3) when determining reasonable expectation of privacy in the context of a vehicle, the <u>Aguirre</u> factors are directly applicable.  748 F.3d 41, 47 (1st Cir. 2014).

Third and finally, there does seem to be a general

32

consensus among the federal courts that individuals that have possessory interests in a vehicle but who are not present in the vehicle at the time it is stopped generally do not have Fourth Amendment "standing" to object to a *motor vehicle stop*. See e.g., United States v. Powell, 929 F.2d 1190, 1195 (7th Cir. 1991) ("The personal nature of the interests implicated by a vehicle stop persuade us that a vehicle owner who is not in his car at the time it is stopped should not, absent unusual circumstances not present in this case, have standing to object to the stop"); United States v. Ruiz, 345 F. Supp. 171, 173 (D. Mass. Nov. 29, 2004) (citing approvingly to Powell and finding that although defendant may have had an ownership interest in a recreational vehicle, he did not have Fourth Amendment "standing" to challenge a vehicle stop itself in part because he was not present in the vehicle when it was stopped); United States v. Gonzalez, 2014 U.S. Dist. LEXIS 162121, *37 (E.D Mich. Nov. 19, 2014) ("Vehicle owners absent at the time their vehicle is stopped cannot challenge the stop.") (citations omitted). That said, the First Circuit appears to have not yet directly addressed this issue.

To be clear, however, regardless of whether a defendant has "standing" to challenge the *stop* of a vehicle, they may nevertheless have "standing" to challenge a *subsequent search* of that vehicle. See e.g., United States v. Muyet, 946 F. Supp. 302, 304-305 (S.D.N.Y. Dec. 3, 1996) (collecting cases from federal courts from around the country for the proposition that "[t]he question of standing to challenge a stop of a car

presents different issues from that of standing to challenge a
subsequent search") (citations omitted).  Said differently, a
defendant that was absent from a vehicle when it was stopped
could lack Fourth Amendment "standing" to challenge the stop but
retain "standing" to challenge the search that occurred soon
after the stop. See id.

### b. **Application -- Fourth Amendment "Standing"**

#### i. **Vick Does Not Have "Standing" to Challenge the Stop of the Nissan Altima**

In his second suppression motion, Vick challenges both the
apprehension team's *stop* of the Nissan Altima *as well as the
subsequent, purported inventory search*.  It is undisputed that
Vick was not present in the Nissan Altima when it was stopped.
Although the occupants of the vehicle may have had Fourth
Amendment "standing" individually, that issue is not before the
Court since it is dealing only with Vick's motion and because
Fourth Amendment rights are "personal rights which...may not be
vicariously asserted."  See e.g., Cardona-Sandoval, 6 F.3d at
21.  Since Vick was not in the vehicle when it was stopped, the
Court finds that he lacks "standing" to challenge the
constitutionality of the vehicle stop itself.  See e.g., Ruiz,
345 F. Supp. at 173; Gonzalez, 2014 U.S. Dist. LEXIS 162121, at
*37 ("Vehicle owners absent at the time their vehicle is stopped
cannot challenge the stop.")  Accordingly, the Court may not and
will not engage in any Fourth Amendment analysis with respect to

the vehicle stop.  See e.g., Lewis, 40 F.3d at 1333 (explaining that an "expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis") (citations omitted and emphasis added).  Accordingly, evidence of the stop itself will not be suppressed.  However, for the avoidance of any doubt, the facts and circumstances related to the vehicle stop are of course still relevant to the question of whether the purported inventory search that followed the stop was constitutional -- an issue that the Court will reach if and only if Vick has "standing" to challenge it.

### ii. Vick Does Have "Standing" to Challenge the Subsequent, Purported Inventory Search

The fact that Vick does not have "standing" to challenge the motor vehicle stop itself has no bearing on whether he has "standing" to challenge the subsequent, purported inventory search since the latter inquiry "presents different issues" from the first.  See e.g., United States v. Muyet, 946 F. Supp. at 304-305.  To show that he has "standing" to challenge the purported inventory search, Vick must demonstrate that he had "a reasonable expectation of privacy in the area searched and in relation to the items seized." See e.g., Aguirre, 839 F.2d at 856.  For the reasons explained below, the Court concludes that Vick has carried this burden and that he therefore has "standing" to challenge the purported inventory search.

The starting point for the Court is of course the Aguirre

factors, although no one factor is controlling.  839 F.2d at 856-857; Bates, 100 F. Supp. 3d at 83.

Here, ownership weighs against a finding that Vick had "standing" in the vehicle.  Warner testified at trial that he owned the Nissan Altima. [ECF No. 136-1 at 8].  That said, possession and/or control weigh in favor of finding "standing." Warner testified that Vick lived with him where the car was kept and that Vick was generally free to borrow the car to go back and forth to work.  [ECF No. 136-1 at 6; 8].  It is also important to note that even the apprehension team knew that Vick possessed the Nissan Altima.  For example, Trooper Andrews testified that prior to the arrest operation, he had been briefed that Vick was expected to be driving the Nissan Altima. [ECF No. 146 at 59].  Further, Sergeant Martinez implicitly recognized Vick's possession and control of the car when he asked Vick if he could place his pocketknife in the car.  [Ex. A-1 at 2].  In sum, possession and control is a factor that weighs heavily in favor of "standing."

Consideration of the historical use of the property searched also weighs in favor of finding "standing."  Warner testified that Vick had borrowed the Nissan Altima "multiple times" over some "weeks."  [ECF No. 136-1 at 10]. Although it is true that Vick was apparently not the only one borrowing the car [id. at 43], this factor, on balance, weighs strongly in favor of finding "standing."  Ability to regulate access weighs in favor of "standing," too.  Here, Warner testified that he only had one set of keys to the Altima.  [Id.

36

at 10].  Since he frequently allowed Vick to borrow the car, it follows that when Vick had the keys, Vick had the exclusive ability to regulate its access.  This fact is further evidenced by the fact that Warner had to pick up the keys from Vick's employer.  [Id. at 47].  Thus, this factor, too, weighs in favor of finding "standing."

The totality of the surrounding circumstances is the factor that perhaps weighs most strongly in favor of "standing."  As described at length *supra*, members of the MSP VFAS team invested considerable time and human capital in creating the conditions that would allow them to gain access to the Nissan Altima in service of exploring what property Vick might have been keeping in the vehicle.  By way of a non-exhaustive list of facts, the Court notes that the purported inventory search occurred several hours after Trooper Dolan's fruitless "plain view" search.  See [ECF No. 146 at 24]; [Ex. F].  Moreover, more than one member of the MSP VFAS team were directed to spend at least one and a half hours waiting in the hopes that Warner would eventually arrive and set in motion an opportunity to attempt a purported inventory search.  Further, the apprehension team appear to have actually treated the Nissan Altima *as more Vick's vehicle than Warner's* -- as evidenced by the fact that they gave Vick the right to have a third party pick up the vehicle but then did not extend this privilege to Warner.  See [ECF No. 146 at 30]; [ECF No. 136-1 at 20].  Accordingly, the totality of the surrounding circumstances weighs very strongly in favor of Vick having "standing."

Turning to the final two factors, the Court finds that Vick had a <u>subjective anticipation of privacy in the vehicle</u> and that, under the facts in this case, that expectancy was objectively reasonable.  Here, Vick would certainly have subjectively anticipated that he had some reasonable expectation of privacy in the vehicle that he was regularly borrowing from his family member and roommate.  Moreover, this was manifestly an objectively reasonable expectation.  Indeed, as the First Circuit observed in Almedia, "in some circumstances, a person who borrows a vehicle with the owner's permission may have a reasonable expectation of privacy."  748 F.3d at 47.  That was certainly the case here.  Warner testified that he had no problem with Vick borrowing the car since he was using it to do something "productive" (i.e., driving back and forth to work). [ECF No. 136-1 at 11]. Here, Vick was using the car for the very purpose that Warner had blessed.  It therefore follows that both of these final two factors also weigh in favor of a finding of "standing."  In sum, an analysis of the Aguirre factors lead loudly and clearly to a finding that Vick has "standing" to challenge the purported inventory search. 839 F.2d at 856-57. Said differently, the Court is satisfied that Vick "thought of the place [i.e., the Nissan Altima] [] as a private one, and treated it as such."  See id.

Notably, the notion that Vick had a possessory interest in the Nissan Altima was central to the Government's felon-in-possession case in the January 2024 trial.  At trial and during the closing, counsel for the Government stated that Vick had

borrowed the Nissan Altima from his uncle and was using it to
get to work.  [ECF No. 90 at 129].  Counsel for the Government
also referred to the Nissan Altima as "his [i.e., Vick's] car"
and "his [i.e., Vick's vehicle]" during the closing.  [Id. at
129; 131].[15]

Since the Court finds that Vick has Fourth Amendment
"standing" to challenge the purported inventory search, it may
now permissibly address those substantive Fourth Amendment
issues.

### c. Legal Standard -- Inventory Searches

As a general matter, a law enforcement officer may only
seize property pursuant to a warrant that is based on probable
cause that describes the place to be searched and the property
to be seized.  Horton v. California, 496 U.S. 128, 133, n. 10
(1990) (emphasis added).  Warrantless searches are deemed *per se*
unreasonable unless they fall within "a few specifically
established and well-delineated exceptions."  Arizona v. Gant,
556 U.S. 332, 332 (2009).  One such exception is the  "inventory
search" of a vehicle.  Colorado v. Bertine, 479 U.S. 367, 371

---

[15] Interestingly, some federal courts have even found that a
defendant may establish Fourth Amendment "standing" simply by
pointing to evidence submitted by the government alleging that
the defendant had a possessory interest in a particular place or
object.  See e.g., United States v. Ginyard, 2019 U.S. Dist.
LEXIS 8797, *12-13 (W.D. Pa. Jan. 18, 2019) (explaining that "a
defendant need not affirmatively present evidence of his
legitimate expectation of privacy; rather, he may simply "point
to specific evidence in the record which the government [has]
presented and which establishe[s] his standing") (citation
omitted).  To be clear, the Court is not applying such a rule
here, but it does take note of the apparent tension between the
Government's position at trial and its position at the motion to
suppress.

(1987).  Following a vehicle's impoundment, the Fourth Amendment allows officers to perform an "inventory search" to catalog the vehicle's contents without a warrant. United States v. Davis, 909 F.3d 9, 17 (1st Cir. 2018).  As a prior session of this Court has helpfully explained, "[i]nventory searches are justified based on community caretaking functions, including, for example, the protection of property, the flow of traffic and the safety of the public and police." United States v. Mensah, 796 F. Supp. 2d 265, 268 (D. Mass. June 17, 2011) (citations omitted).

When, as here, the Government argues that a warrantless vehicle search was a valid inventory search, it bears the burden of proving that this specific exception to the warrant requirement applies.  See e.g., United States v. Cafiero, 242 F. Supp. 2d 49, 55 (D. Mass. Jan. 28, 2003). The First Circuit has clarified that the legitimacy of an inventory search largely depends on the police officer's reasons for seizing the vehicle. United States v. Del Rosario-Acosta, 968 F.3d 123, 126 (1st Cir. 2020) (citations omitted).  Officers are required to have "solid, noninvestigatory reasons for impounding a car." Id. (emphasis added).  Additionally, in evaluating the constitutionality of a purported inventory search, the Court must consider "all the facts and circumstances of a given case." United States v. Coccia, 446 F.3d 233, 239 (1st Cir. 2006).

Several additional points are important to highlight here. First, it is critical that, impoundment must not be a "mere subterfuge for investigation." United States v. Rodriguez-

Morales, 929 F.2d 780, 787 (1st Cir. 1991). (citation omitted). Indeed, as the Supreme Court has said, a key principle is that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990) (emphasis added).

Second, the "presence of both investigatory and community caretaking motives does not render unlawful an objectively reasonable decision to impound." United States v. Sylvester, 993 F.3d 16, 24 (1st Cir. 2021) (citation omitted). Third, officers are not constitutionally required to select the "least intrusive way" of fulfilling their community caretaking obligations. Id.

Fourth, within this Circuit, the presence of a police department protocol outlining noninvestigatory reasons to impound a vehicle is a "significant factor cutting in favor of blessing a seizure done pursuant to such an objective protocol." Del Rosario-Acosta, 968 F.3d at 126-127 (citation omitted). If, as here, a police department has a standardized policy or procedure, it must be followed for a purported inventory search to be deemed reasonable. See e.g., Rodriguez-Morales, 929 F.2d at 780, 787, n. 3(observing that "in the context of inventory searches, the [Supreme] Court has concluded that searching is reasonable only if performed according to standardized procedures..." and noting that the safeguards that the Supreme Court had created were driven by a recognition of the inherent nature of inventory searches, in which "the police face strong temptations to go beyond administrative needs and rummage for

41

investigatory purposes...") (citations omitted).  Notably,
failure to adhere to standardized procedures can make an
officer's subjective intent relevant. See e.g., United States v.
Hawkins, 279 F.3d 83, 86 (1st Cir. 2002) ("[t]he subjective
intent of the officers is not relevant so long as they conduct a
search according to a standardized inventory policy") (citation
omitted and emphasis added).

Fifth and most perhaps importantly, the Court must always
be mindful that "[t]he touchstone of the Fourth Amendment is
reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991).

### d. Application -- The Purported Inventory Search

After considering, as it must, "all the facts and
circumstances" of this case, the Court has concluded that the
purported inventory search was unreasonable and ultimately
unconstitutional.  See Coccia, 446 F.3d at 239 (emphasis added).
While perhaps none of the Court's stated reasons would be
independently sufficient to render the purported inventory
search unlawful, the Court finds that the unique constellation
of facts present here, taken together, constituted a violation
of Vick's Fourth Amendment rights that requires suppressing the
fruits of the purported inventory search.

### i. Failure to Sufficiently Follow Standardized Procedures

First, the MSP VFAS team members that conducted the
purported inventory search did not sufficiently comply with
their department's standardized policies and procedures.  See
[Ex. B (MSP tow policy)] and [Ex. C. (MSP inventory policy)].

Although it is generally true that "minor deviations" do not
render a purported inventory search unreasonable (see e.g.,
United States v. Lomeli, 76 F.3d 146, 148-149 (7th Cir. 1996),
the deviations from standardized procedure in this case were
numerous and material.

        To start, the Court finds that the MSP VFAS team members'
actions and inactions associated with executing the impoundment
and purported inventory search did not adequately prioritize
"[p]ublic safety" -- which, as the Towing policy provides -- is
supposed to be of "paramount importance" and the "primary
concern" during its implementation.  See [Ex. B at 1-2].  Here,
the MSP VFAS team members acknowledged that they intentionally
declined to initiate a stop of the Nissan Altima while Warner
was driving across the parking lot despite knowing (a) that he
was not legally allowed to drive and that, more importantly (b)
there was a small child in the vehicle.  [ECF No. 146 at 35; 52;
65].

        Relatedly, after they stopped the vehicle and informed
Warner that the Nissan Altima would be towed, they apparently
took no meaningful steps to ensure that Warner and his small
child could safely leave the scene.  Instead, they merely
informed Warner that he would be summonsed and dismissed him and
his child from the scene.  Given this apparent rush to initiate
the purported inventory search, the Court finds that the MSP
VFAS team members did not treat the public safety as their
"primary concern" or of "paramount importance" as required by
the tow policy when they attempted to execute the tow policy --

43

which, in turn, was the triggering event for their apparent right to conduct a subsequent inventory search.  [Ex. C, at 1 (MSP inventory policy noting that an inventory search can be conducted, among other times, when a vehicle is towed "[a]s outlined within TRF-09 Towing [i.e., the towing policy.]")

Another failure to follow standardized procedure occurred when the MSP VFAS team members apparently failed to inquire of Warner, prior to calling a tow company, whether he, as the "owner", could "direct the [MSP] member to dispose of the vehicle in some lawful and reasonable manner..."  [Ex. B at 3][16].  Instead, they simply told him that it was going to be towed.  [ECF No. 136-1 at 20 (Warner testifying that, the MSP VFAS team "said the car was going to be towed.")]   This was a failure to follow the applicable standardized procedure.  Relatedly, there is no evidence that the MSP VFAS members followed the requirement to inquire of Warner whether he had a "preference for a particular tow company or roadside service organization."  [Ex. B at 3].

Turning to the inventory policy [Ex. C.], the Court finds that there were a number of meaningful ways that the MSP VFAS team failed to follow that standardized procedure.  First, the policy provides that MSP members must conduct a "detailed inspection of the interior and exterior of the vehicle for

---

[16] Interestingly, the apprehension team had seemingly afforded this privilege to Vick himself (by allowing him (through his supervisor) to call Warner to pick up the vehicle) even though the towing policy probably did not even control in that instance.

damages and missing parts, as well as to locate and record the contents of the vehicle."  [Ex. C at 2] (emphasis added). Relatedly, "Members" -- such as the responding MSP VFAS team members here -- are required to "[a]ccurately record on the motor vehicle inventory form a complete listing of the general condition of the vehicle and its contents."  Id (emphasis added).

Here, however, purported inventory form[17] that the Government has submitted as an exhibit does not appear to contain any information about the general condition of the car as required; nor does it offer insight into any "missing parts." See [Ex. E at 1-2].  Strikingly, the purported inventory search inventory form contains a great deal of detail about the firearm that was seized but yet lacks key details about some of the other items that were in the car.

For example, it provides that the vehicle contained a "Socket Set (Tools)" but yet there is no detail about *how many* tools were contained in this "set."  [Id. at 1].  The failure to provide sufficient detail here is a deficiency that runs counter to a core, underlying purpose of a true inventory search -- namely "protect[ing] ...the [MSP] and tow company against false claims or lost, stolen, or vandalized property..." [Ex. C at 1].

In sum, the Court finds that the failure to comply with each of these clearly-written standardized procedures contributes to a finding that the purported inventory search was

---

[17] The Court notes that this document is titled, "MSP Offense Report."  [Ex. E].

improperly conducted.  <u>See e.g.,</u> <u>United States v. Taylor</u>, 636 F.3d 461, 464 (8th Cir. 2011) (finding a failure to comply with a police department's standardized inventory search policy and concluding, among other things, that an officer's description of a impounded vehicle's many tools as merely "misc. tools" did not constitute the detailed, itemized inventory that was required.)

    ii.  **<u>The Apprehension Team Had a Purely Investigative Intent</u>**

As the <u>Hawkins</u> Court made clear, the subjective intent of police officers conducting an inventory search is not relevant "so long as they conduct [the] search according to a standardized inventory policy."  279 F. 3d at 86.  Since, as described above, the MSP VFAS team members that conducted the impoundment and purported inventory search failed to sufficiently follow both of the applicable MSP policies, they have made their subjective intent(s) relevant.  <u>See</u> <u>id.</u>

Although it is true that the presence of an investigative intent does not invalidate an <u>otherwise valid</u> inventory search (<u>see e.g.,</u> <u>United States v. Lewis</u>, 3 F.3d 252, 254 (8th Cir. 1993) (emphasis added); purported inventory searches marked by the police "act[ing] in bad faith or for <u>the sole purpose of investigation</u>" are very likely to be found invalid.  <u>See</u> <u>Bertine</u>, 479 U.S. at 372 (emphasis added).

Here, the Court has concluded that the MSP VFAS team members were acting with the "sole purpose of investigation." <u>See</u> <u>id.</u> Indeed, consideration of "all the facts and circumstances" in the case lead the Court to conclude that a

*purely investigatory intent* drove the apprehension team's actions on the day of Vick's arrest -- and that this intent culminated in a purported inventory search that essentially constituted "a ruse for a general rummaging" designed to "discover incriminating evidence." See Florida v. Wells, 495 U.S. 1, 4, (1990) (emphasis added).

A number of facts weigh heavily in favor of this conclusion.  First, the above-described repetitive and persistent questioning of Vick about what vehicle he was driving and the status of his car keys provided the first glimpse of the apprehension team's investigatory intent.  [Ex. A-1, at 1-3]. Second, the fact that a law enforcement officer seems to have said "...*once* we get in the car..." shortly after an unsuccessful plain view search is another troubling and unexplained fact that undermines the argument that the purported inventory search was legitimate.  See [Ex. F] (emphasis added).

Third, the fact that Trooper Dolan, Trooper Andrews and the other highly trained members of the tactical MSP VFAS team were made to drive all the way (approximately 16.1 miles each way) from the Millbury Barracks back to the 583 Quaker Highway location simply so that an unregistered, uninsured vehicle bearing improper license plates could be impounded strains credulity.  The only reasonable explanation for this second operation was a purely investigatory intent.  That this was the sole motivation becomes even more apparent when the Court considers that each of these highly trained law enforcement officers spent at least one and a half hours idling in the 583

47

Quaker Highway parking lot waiting for Warner to arrive.

If the Court had any remaining doubt as to the true subjective intent of the apprehension team upon their arrival back at the 583 Quaker Highway location, it vanished as the Court heard testimony that the apprehension team allowed someone that they knew could not legally drive and who had a child in the vehicle (i.e., Warner) to drive across the private parking lot uninhibited until shortly after he entered a public way. After the vehicle was stopped, the apprehension team appeared to dismiss Warner as quickly as possible -- telling him that he would be issued a summons and could leave the scene.  Warner's quick dismissal is yet further evidence that the true purpose of the purported inventory search was to search the vehicle for contraband.  It therefore was unsurprising that the purported inventory search started not just in the trunk (a place where Trooper Dolan and Trooper Andrews had just seen Warner move an object), but that the trooper "inventorying" the trunk started with the object that he had just seen Warner move from the backseat.  For all of these reasons, the Court concludes that the purported inventory search in this case constituted "a ruse for a general rummaging in order to discover incriminating evidence" against Vick.  See Wells, 495 U.S. at 4.

### e. Conclusion & Suppression Decision

Since the Court has concluded that the purported inventory search was invalid, it must now determine what must be suppressed.  The Court finds that since the inventory search constituted a violation of Mr. Vick's rights under the Fourth

Amendment, all items seized during that invalid search shall be suppressed.  See e.g., United States v. Goodrich, 183 F. Supp. 2d 135 (Oct. 29, 2001) ("I will grant the motion to suppress on the grounds that the inventory search was impermissible and that the [subsequent] search of the bag [found in the trunk] was tainted by it"); United States v. Cafiero, 242 F. Supp. 2d 49, 57-58 (D. Mass. Jan. 28, 2003).

## VI.   Conclusion

For the reasons stated above, the Court has **GRANTED** Vick's motion to suppress statements [ECF No. 115] and has **GRANTED** Vick's second motion relative to the purported inventory search. [ECF No. 129].  Its specific suppression decisions are contained above.

**IT IS SO ORDERED.**

Dated: July 1, 2024

/s/ Margaret R. Guzman
Hon. Margaret R. Guzman
United States District Judge