UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 23-CR-40003-MRG |
| | ) | |
| CHARLIE VICK, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MOTION FOR LIMITED RECONSIDERATION OF
THE COURT'S ORDER AND OPINION SUPPRESSING EVIDENCE [ECF 153, 157]**

While the government disagrees with the Court's *Miranda* and standing rulings, it only moves the Court to reconsider its ruling invalidating the impoundment and inventory search.

The impoundment and inventory search of the Nissan are presumptively reasonable since they were conducted pursuant to written state police policies. The alleged deviations from those policies are immaterial. Vick thus bears the burden of establishing that there were *no non-investigatory reasons* for either action and that the officers' *sole purpose* was to search for evidence of crime, in a case where (a) everyone agrees the car was validly stopped for multiple violations and could not have been driven away even by a licensed driver since it was unregistered, uninsured, and had unauthorized plates attached to it, (b) these are textbook situations in which a car should be towed, and (c) an inventory in these circumstances is not only reasonable but mandatory. Vick cannot carry his two-part burden on this record. The Court's contrary ruling—based mainly on issues Vick himself never raised—is legally and factually unsound.

**Background**

Charlie Vick lived in Rhode Island with his uncle, Jamie Warner. [Ex. D at 60-61, 63-67, 101]. On February 17, 2023, Vick allegedly assaulted his girlfriend by throwing bleach on her and

1

pointing a loaded gun at her head and threatening to kill her. [Tr. 21-23, 41, 56-57; ECF 52 at 1-2]. Vick was then on federal supervised release due to a conviction for being a felon in possession of ammunition. [Tr. 57; *United States v. Vick*, 1:19-CR-00011-WES (D. R.I)]. Vick also "had prior adult convictions for forgery of a check and related charges, carrying a dangerous weapon, attempting to commit a crime (breaking and entering), threatening to commit a crime (kill), unlicensed operation of a motor vehicle, possession of a large capacity weapon, and knowingly receiving stolen property." *United States v. Vick*, 852 F. App'x 546, 547 n.1 (1st Cir. 2021).

On February 18, Vick's girlfriend reported the crime to the police and supplied photos of the handgun Vick used during the assault—a 9 mm Glock pistol with an affixed tactical light—as well as a photo of Vick pointing the gun. [ECF 52 at 1-2]. On February 19, Rhode Island issued an arrest warrant for Vick on charges of domestic assault and battery and related offenses. [Tr. 21, 41; ECF 128 at 1].

Just before 7:00 a.m. on February 21, a task force of Rhode Island and Massachusetts officers saw Vick drive a Nissan Altima to his place of work in Uxbridge, Massachusetts and park in the parking lot. [Tr. 20-21, 42-43, 57]. Upon arrest, Vick initially denied he had just driven into the lot, but car keys were found in his pants pocket along with a pocketknife. [Ex. A; Ex. A-1 at 1-2]. Vick asked that both items be left with his boss so his uncle could retrieve them and the car. [Tr. 58-59; Ex. A; Ex. A-1 at 3-4]. The officers agreed. [Tr. 26, 59; Ex. A; Ex. A-1 at 4]. Meanwhile, Trooper Patrick Dolan, standing outside the Nissan, saw a jacket on the backseat. [Tr. 24; Ex. G].

After transporting Vick to the barracks in Millbury, Massachusetts, officers discovered the Nissan was unregistered and uninsured and had unauthorized plates attached to it. [Tr. 25-27, 59-60, 62-63, 65-66]. They could not then determine who owned the car and believed it might be stolen. [Tr. 62-63, 65-66]. They also learned Vick's uncle could not lawfully drive it since his

license was suspended. [Tr. 30, 60]. Faced with the specter of an unlicensed operator driving an unregistered and uninsured and possibly stolen car with illicit plates back to Rhode Island, several task force officers returned to the parking lot to wait for Warner's arrival. [Tr. 28-29, 60].

Later that day, Warner arrived in the lot in a white Lexus driven by another nephew. [Tr. 30-31, 44, 60, 64; Ex. D at 73]. He then obtained the keys to the Nissan from Vick's employer. [Tr. 31-32, 64; Ex. D at 73-74, 106-107]. Warner and his ten-year-old son thereafter got in the Nissan. [Tr. 64; Ex. D at 74]. Before leaving, however, Warner removed a jacket from the car, balled it up, and placed it in a red backpack in the trunk. [Tr. 39, 64; Ex. D at 74-79, 106-110].

Just after Warner drove onto the street, the officers stopped him for driving an unregistered and uninsured car without a license. [Tr. 33-37, 52 ("It was pulled over immediately after getting on the road."), 65; Ex. D at 78-79]. Warner admitted his license was suspended. [Tr. 60].

Officers informed Warner the car would need to be towed. [Tr. 33-34, 60; Ex. D at 79]. That decision was in accord with Massachusetts State Police General Order TRF-09 regarding towing, which states in pertinent part that officers "are authorized to remove (or cause to be removed) a vehicle found upon any way . . . when the vehicle is . . . [n]ot validly registered or insured in violation of law" or where the operator is "[n]ot properly licensed," so long as (a) "[t]here is no alternative operator present who could assume lawful custody of the vehicle" and (b) "the owner or authorized driver cannot direct the [officer] to dispose of the vehicle in some lawful and reasonable manner." [Ex. B at 2]. And Massachusetts State Police General Order TRF-10 provides that an inventory search is mandatory in this situation. [Ex. C].

After telling Warner the Nissan needed to be towed, officers permitted him and his son to leave the scene in the white Lexus driven by the other nephew. [Tr. 36, 44, 61; Ex. D at 79-80].

3

Before the tow truck arrived, Trooper Dolan and two other officers conducted an inventory search of the car. [Tr. 38-39, 45-46, 61]. As part of this, Trooper Dolan opened the trunk and found a loaded 9mm Glock handgun in the jacket stuffed in the red backpack. [Tr. 39, 45-46, 61; Ex. E]. Ultimately one of the three officers, Sergeant Felipe Martinez, prepared a detailed inventory of the contents of the car and it was towed. [Tr. 20, 47-49, 61; Ex. E].

<u>Argument</u>

I.  **The impoundment and inventory search were presumptively lawful**

The community caretaking exception to the warrant requirement is well established. *See Caniglia v. Strom*, 953 F.3d 112, 123 (1st Cir. 2020) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Motor vehicle impoundments—which typically entail inventory searches—are a "classic" example of a police action that falls within this exception. *Caniglia*, 953 F.3d at 127.

The community caretaking conduct of the police is evaluated only for "reasonableness." *Caniglia*, 953 F.3d at 127; *accord United States v. Sylvester*, 993 F.3d 16, 23 (1st Cir. 2021). Moreover, "[p]olice officers enjoy wide latitude in deciding how best to execute their community caretaking responsibilities." *Caniglia*, 953 F.3d at 123. Consistent with that principle, the Supreme Court and the First Circuit have repeatedly rejected the notion that officers must perform their community caretaking functions in the least restrictive or least intrusive manner.[1]

The First Circuit has treated the impoundment and inventorying of a car as distinct actions that merit separate analyses under the community caretaking rubric. *See Davis*, 909 F.3d at 16-18; *Boudreau*, 901 F.3d at 71-73. The government thus addresses each issue separately.

---

[1] *See Colorado v. Bertine*, 479 U.S. 367, 374-75 (1987); *Illinois v. Lafayette*, 462 U.S. 640, 647-48 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 375-76 (1976); *Cady*, 413 U.S. at 447; *Castagna v. Jean*, 955 F.3d 211, 222 (1st Cir. 2020); *Caniglia*, 953 F.3d at 126, 132; *United States v. Davis*, 909 F.3d 9, 17 (1st Cir. 2018); *Boudreau v. Lussier*, 901 F.3d 65, 72-73 (1st Cir. 2018); *United States v. Gemma*, 818 F.3d 23, 32 (1st Cir. 2016); *United States v. Acosta-Colón*, 741 F.3d 179, 207 (1st Cir. 2013); *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 76 (1st Cir. 2007); *United States v. Rodriguez-Morales*, 929 F.2d 780, 786-87 (1st Cir. 1991).

To come within the community caretaking exception, an impoundment must be reasonable under the circumstances, but if it is done pursuant to standard criteria it is presumptively reasonable, even if the procedures are unwritten. *See Bertine*, 479 U.S. at 375-76; *Davis*, 909 F.3d at 16-17; *United States v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006) ("we read *Bertine* to indicate that an impoundment decision made pursuant to standardized procedures will most likely, although not necessarily always, satisfy the Fourth Amendment.").

The impoundment here was plainly reasonable. Because Warner could not operate the car without a license, *see* Mass. Gen. Laws ch. 90, § 10, registration, *see id.* § 9, or insurance, *see id.* § 34J, a written state police order, TRF-09, authorized it to be towed for each of these three separate reasons. Under *Bertine* and *Coccia*, impounding the car pursuant to standardized state police policies—policies that are both sensible and directly applicable—was reasonable without more. A First Circuit decision illustrates the point. In a case where the car's occupants were merely unlicensed, the Court held that once police learned during a traffic stop that "neither occupant was properly licensed to drive, the decision not to let the vehicle continue on its journey was quintessentially reasonable," and "it was completely appropriate for the police to impound the car and bring it to the barracks for safe-keeping." *Rodriguez-Morales*, 929 F.2d at 785.

The ensuing inventory search was also reasonable. Over thirty years ago, the Supreme Court observed that "inventory searches are now a well-defined exception to the warrant requirement." *Bertine*, 479 U.S. at 371; *United States v. Rivera*, 988 F.3d 579, 581 (1st Cir. 2021) (quoting this statement from *Bertine*). Nine years later, it summarized the exception this way: "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996). As this

passage reflects, an inventory search furthers three principal goals: (1) "the protection of the owner's property while it remains in police custody"; (2) "the protection of the police against claims or disputes over lost or stolen property"; and (3) "the protection of the police from potential danger." *Opperman*, 428 U.S. at 369.

So long as an inventory search is conducted pursuant to criteria that are specific enough to prevent it from being a "ruse for a general rummaging in order to discover incriminating evidence," *Florida v. Wells*, 495 U.S. 1, 4 (1990), it is presumptively reasonable. *See Opperman*, 428 U.S. at 372 ("[t]he decisions of this Court point unmistakably to the conclusion reached by both federal and state courts that inventories pursuant to standard police procedures are reasonable"); *see also Bertine*, 479 U.S. at 372-76; *Lafayette*, 462 U.S. at 647-48.

The First Circuit has adhered to this rule without fail. *See, e.g.*, *Rivera*, 988 F.3d at 581-83; *Boudreau*, 901 F.3d at 73; *United States v. Richardson*, 515 F.3d 74, 85 (1st Cir. 2008); *United States v. Hawkins*, 279 F.3d 83, 86 (1st Cir. 2002). Indeed, it has said that "[o]nce a car is impounded, an inventory search follows as a matter of course in prudent law enforcement practice, if for no other reason than to make a record to protect the police against a later claim that custodial negligence allowed the loss of valuable property by theft or otherwise." *Jaynes v. Mitchell*, 824 F.3d 187, 197 (1st Cir. 2016) (Souter, Associate Justice); *accord Richardson*, 515 F.3d at 85 ("[t]he Fourth Amendment permits a warrantless inventory search if the search is carried out pursuant to standardized policy."); *Hawkins*, 279 F.3d at 86 ("Because the district court found that there was a standardized, albeit unwritten, inventory policy compelling officers to open containers to determine their contents during an inventory, the drug evidence was properly obtained.").

Here, the Nissan was properly impounded pursuant to State Police order TRF-09, as discussed above. Under State Police order TRF-10, when a car is towed in these circumstances, an

6

officer *must* conduct an inventory search of the car and its contents, including closed but unlocked containers. [Ex. C]. Such an inventory is mandatory: "The Department *shall inventory* any vehicle ordered towed, removed, or impounded . . . [a]s outlined within TRF-09 Towing." [Ex. C at 1 (emphasis added)]. Tracking *Whren* and *Opperman*, TRF-10 states that the purposes of the inventory search are to protect: (1) "[t]he vehicle and its contents"; (2) "[t]he Department and tow company against false claims of lost, stolen, or vandalized property"; and (3) "[t]he member(s) [*i.e.*, officers] and the public from dangerous items that might be in the vehicle." [Ex. C at 1].

The criteria in TRF-09 and TRF-10 are surely specific enough to curb arbitrary inventory searches and to ensure that such searches are conducted "on the basis of something other than suspicion of evidence of criminal activity," *Bertine*, 479 U.S. at 375, and that they are not a "ruse for a general rummaging in order to discover incriminating evidence," *Wells*, 495 U.S. at 4. *See Rivera*, 988 F.3d at 581-83 (upholding impoundment and inventory under TRF-09 and TRF-10).

The officers complied with TRF-09 and TRF-10. Faced with a car that could not be driven from the scene for three separate reasons cited in TRF-09, they properly called for a tow truck. They then conducted an inventory search in accordance with TRF-10. That search was reasonable by any measure. *See Opperman*, 428 U.S. at 373 (observing that in its earlier opinion in *Cooper v. California*, 386 U.S. 58 (1967), it had "upheld the inventory of a car impounded under the authority of a state forfeiture statute . . . [e]ven though the inventory was conducted in a distinctly criminal setting and carried out a week after the car had been impounded") (footnote omitted).

Notwithstanding all of this, the Court faults the impoundment and inventory search on five main grounds. The government addresses each in turn.

<u>The alleged safety issue</u>. In its lead claim—one never developed by Vick—the Court says the officers jeopardized the safety of Warner and his young son. The Court begins by quoting [ECF

157 at 16, 43] language from TRF-09's preamble stating that "[p]ublic safety is the Department's primary concern and shall guide the application of this policy" [Ex. B. at 1], and by stripping from context the phrase "paramount importance" [ECF 157 at 43] in a TRF-09 provision stating that "[p]ublic safety is of paramount importance *when considering the time, manner, and method of off-loading and/or towing a large vehicle*" and that "[t]he key determinants are current and impending road, weather, and traffic conditions." [Ex. B at 2 (emphasis added)]. The Court then asserts the officers "did not adequately prioritize" public safety for two reasons: (1) "they intentionally declined to initiate a stop of the Nissan Altima while Warner was driving across the parking lot despite knowing (a) that he was not legally allowed to drive and that, more importantly (b) there was a small child in the vehicle"; and (2) after informing Warner the car would need to be towed, "they apparently took no meaningful steps to ensure that Warner and his small child could safely leave the scene" and "merely informed [him] that he would be summonsed and dismissed him and his child from the scene." [ECF 157 at 43]. There are two separate responses.

      First, the Court's analysis is legally flawed. The generalized preamble statement and the inapplicable "large vehicle" provision do not supply cognizable bases for invalidating either the impoundment or the inventory search. Indeed, they are simply irrelevant to a proper Fourth Amendment inquiry. If, as settled law holds, officers need not perform their community caretaking functions in the least restrictive or least intrusive manner, it follows that they need not invariably pursue the safest of all possible methods of executing those duties on pain of suppression of evidence. *See Caniglia*, 953 F.3d at 123 ("Police officers enjoy wide latitude in deciding how best to execute their community caretaking responsibilities."). And even if the Fourth Amendment authorizes district courts to scrutinize how safely officers carried out their impoundment and inventory duties, the criticized actions were at best ancillary to the impoundment and inventory

8

process, making them of little or no relevance in any event. Both issues are legal red herrings. Neither the Court nor Vick cite any decision suggesting this is an appropriate mode of analysis.

Second, the Court's accusations also fail as a factual matter. Even assuming the officers could have stopped Warner before he left the lot even though the pertinent traffic provisions apply only when a vehicle is being driven on a public "way," *see* Mass. Gen. Laws ch. 90, §§ 9, 10, 34J, there is no sign the officers jeopardized public safety or the safety of Warner or his son by allowing Warner to drive what the Court concedes was a "short distance" [ECF 157 at 14] onto the street. One officer testified without contradiction that the car "was pulled over immediately after getting on the road." [Tr. 52; *see also* Tr. 33 ("He was pulled over a short distance away.")]. A second officer agreed with defense counsel that the car "was pulled over after it left the parking lot onto a public way." [Tr. 65]. And Warner himself testified he was pulled over "immediately" after leaving the parking lot. [Ex. D at 78-79]. The notion that anyone's safety was genuinely at risk finds no foothold in the record. Equally baseless is the suggestion that the officers simply "dismissed" Warner and his son and took "no meaningful steps" to help them "safely leave the scene." [ECF 157 at 43]. In fact, Warner himself agreed the officers "allow[ed] [him] to reach out to [his] nephew Daryl to come pick [him] up" in the white Lexus and that thereafter they left the scene in that car without incident. [Ex. D at 79]. Trooper Dolan confirmed this. [Tr. 33, 44]. Not only that, but two officers actually helped Warner find his cellphone so that he could use it to call his nephew Daryl for this ride. [Tr. 44-45]. Even if the Court denies reconsideration, it should strike its unsupported allegations, which it apparently intends to publish. *See United States v. Vick*, __ F. Supp. 3d__, No. 4:23-CR-40003-MRG, 2024 WL 3278840 (D. Mass. July 1, 2024). Such unfounded criticisms of the officers' conduct have no place in any legal filing, let alone a published judicial opinion.

9

<u>The TRF-09 "dispose" clause</u>. Citing a TRF-09 clause providing that, before calling a tow truck, an officer "*shall* inquire whether the owner or authorized driver can direct the [officer] to dispose of the vehicle in some lawful and reasonable manner" [Ex. B at 3 (emphasis in original)], the Court remarks that the officers "apparently" did not so inquire of Warner and gave him no "opportunity to have a properly licensed third-party come and pick up the vehicle." [ECF 157 at 14, 44]. Once again, Vick never raised this issue. The short answer is that even a properly licensed third-party could not have driven the car away for multiple reasons, and there was no other evident method of disposal aside from towing. Indeed, had the officers allowed someone else to drive off in the unregistered, uninsured car with unauthorized plates, that would have posed a far greater public safety issue than merely allowing Warner to drive across the parking lot. The officers were not required to offer Warner an illusory "opportunity" to contact a third-party driver. *Cf. United States v. Cartwright*, 630 F.3d 610, 613, 616 (7th Cir. 2010) (rejecting challenge to impoundment based on fact that "defendant testified that upon learning the car would be towed she asked the officers to allow her to have someone else move it, but they refused," because "no one could have lawfully driven Golliday's car from the scene, as it did not have the functional license plate lamp required by Indiana law."). And even if the officers somehow deviated from TRF-09, such a minor transgression is of no moment anyway, as an on-point First Circuit opinion discussed below holds.

<u>The TRF-09 tow preference clause</u>. Relying on a TRF-09 clause providing that officers "*shall* also inquire if there is a preference for a particular tow company or roadside service organization" [Ex. B at 3 (emphasis in original)], the Court—unlike Vick himself—finds it significant that the officers "did not ask Warner for his preference in towing company or roadside service company." [ECF 157 at 14, 44]. That concern is also misplaced in light of the same First Circuit opinion.

10

The First Circuit recently rejected identical claims in a case where the defendant argued an impoundment was unreasonable because the "officers did not inform [him] that he could contact someone" to retrieve the car and "[t]hey also did not ask him whether he had a preferred towing service." *Sylvester*, 993 F.3d at 18. The Court upheld the impoundment as reasonable and brushed aside the claims in a single sentence: "The officers' failure to fully comply with the Impound and Inventory Policies with respect to the impoundment does not change this result." *Id.* at 24 (citing *Coccia*, 446 F.3d at 241); *see also Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003) ("[L]aw enforcement officials are not required to give arrestees the opportunity to make arrangements for their vehicles when deciding whether impoundment is appropriate," citing *Bertine*). That should end the matter. And this explains Vick's silence here.

The *Sylvester* Court also rejected a related pretext claim: "The defendant does argue that the sole purpose of the impound was investigatory, based on the fact that the officers violated aspects of the Hancock County Impound and Inventory Policies by not notifying him that he could request a third party to immediately remove the car and thus created the need for impoundment." *Sylvester*, 993 F.3d at 24. In dismissing that claim, the Court reasoned: "Sylvester did not ask the district court to make a specific finding about why the officers did not comply with those aspects of the policies and none was made, thus precluding any such argument from having merit, even if we were to assume that it otherwise might." *Id.* Likewise here, neither testifying officer was asked about the third-party "dispose" option, thus undermining any possible pretext claim based on this issue even assuming such a claim is theoretically viable. Presumably, though, the officers would have testified that they did not pose the question to Warner because no third-party could have driven away an unregistered, uninsured, car with bogus plates. *Cf. Cartwright*, 630 F.3d at 616. So

11

there is simply no basis for affording suppression based on this issue. As before, neither the Court nor Vick cite any supporting authority for an opposite outcome.

  <u>The removal of items issue</u>. The Court states that the officers "did not inform Warner that he could take any personal items with him." [ECF 157 at 14]. There are three responses. First, although the Court notes [ECF 157 at 17] that TRF-10 states that "[i]f an owner/operator requests to remove or entrust their possessions to another person, without it impeding the towing or impoundment process, such request may be granted, unless the member has probable cause to seize the items" [Ex. C at 2], there is no sign Warner made such a request or that he was deterred from taking anything from the car. To the contrary, Trooper Dolan testified without contradiction that Warner "wasn't prevented from taking anything out of the vehicle" [Tr. 36], and the Court admits Warner "removed . . . his cell phone from the vehicle" [ECF 157 at 14; Tr. 36]. Second, as the Court also concedes [ECF 157 at 17], TRF-10 does not require an officer to advise an owner/occupant that personal items may be removed from the car, so there was no deviation at all from state policy. And third, nothing about this circumstance even remotely calls into question the legitimacy of the impoundment or inventory search.

  <u>Nitpicking the inventory form</u>. Although an officer created a detailed inventory of the 13 items found in the car [Ex. E], the Court nonetheless faults this list on the most technical of grounds, citing two TRF-10 clauses that Vick never identified. The Court notes [ECF 157 at 45] that the inventory form neglected to describe the "general condition" [Ex. C at 2] of the car and did not note whether it had any "missing or damaged parts" [Ex. C at 2]. The Court also states: "Strikingly, the purported inventory search inventory form contains a great deal of detail about the firearm that was seized but yet lacks *key details* about *some of the other items* that were in the car." [ECF 157 at 45 (emphasis added)]. The Court then offers just one example of this "striking"

12

deficiency: the mere fact that the report lists a "Socket Set (Tools)" [Ex. E] "but yet there is no detail about *how* many tools were contained in this 'set.'" [ECF 157 at 45 (emphasis in original)]. A socket set typically consists of a socket wrench and numerous small sockets. *See Oxford English Dictionary*, s.v. "socket set (n.)," March 2024, https://doi.org/10.1093/OED/7909796830 (defining "socket set" as "[a] number of sockets for use with a socket wrench," and quoting as an example of usage: "'Hinds pleaded guilty to stealing an electric drill and a 52-piece socket set.'"). The idea that the inventorying officer was required to individually itemize and describe each such socket or risk suppression of evidence is beyond comprehension. None of these issues strikes at the "core" purpose of a "true inventory search." [ECF 157 at 45]. They are all trivial. And this could explain why, yet again, Vick never pursued any of these points.

The case law undermines the Court's *sua sponte* arguments. Long ago, the First Circuit squarely rejected this very sort of challenge based on technicalities: "We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search." *See United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986). The First Circuit's decision here was unqualified. *Id.* And it is binding on this Court.

*Trullo* is in good company. The consensus in the circuits is that the total failure to prepare an inventory search form or the omission of items from such forms cannot supply a basis—without more—for invalidating an inventory search or for finding pretext. Several of these cases rely on *Trullo* for support.[2] The Court cites no cases that buck this clear trend.

---

[2] *See, e.g., United States v. Magdirila*, 962 F.3d 1152, 1158 (9th Cir. 2020) (rejecting pretext claim "[a]lthough the officers here did not include 'all property' on the CHP 180 form as required by Section 510.2.1" because "they did fill out an inventory form that included some of the property, including an iPhone and an Apple watch."); *United States v. Garay*, 938 F.3d 1108, 1111-12 (9th Cir. 2019) (rejecting pretext claim despite "the absence of any inventory sheet listing the property found inside the car, a list required under the sheriff's department's inventory policy," and the fact that "the officers listed only some property in the Vehicle Report," noting that "[o]ther circuits have expressly recognized that the failure to complete an inventory form does not invalidate an inventory search," and citing *Trullo*), *cert. denied*, 140 S. Ct. 976 (2020); *United States v. Williams*, 777 F.3d 1013, 1016 (8th

The rationale of this solid line of decisions dovetails with the following observation of the Supreme Court: "[I]t is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures *proves* (or is an operational substitute for) pretext." *Whren*, 517 U.S. at 816 (emphasis in original); *see also Wells,* 495 U.S. at 4 ("The policy or practice governing inventory searches should be designed to produce an inventory … But in forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion."); *Bertine*, 479 U.S. at 369-70, 375-76 (upholding a finding that an inventory search of vehicle was conducted for legitimate purposes in light of standardized criteria, despite being performed in a "somewhat slipshod" manner) (cleaned up).

In sum, there is no basis in the record or in the law for concluding that the presumption of reasonableness is inapplicable here.

## II. Vick has not rebutted the presumption of reasonableness

The Supreme Court has suggested an inventory search might raise issues where the record establishes that an officer "acted in *bad faith* or for the *sole purpose* of investigation." *Bertine*, 479

---

Cir. 2015) (rejecting claim that inventory search was invalid or pretextual where "loose items of minimal value" were omitted from the inventory list); *United States v. Garreau*, 658 F.3d 854, 858 (8th Cir. 2011) (the officer's "alleged minor deviation from the policy was not sufficient to render the search unlawful."); *United States v. Mundy*, 621 F.3d 283, 293 (3d Cir. 2010) (the fact that officers "produced an inventory of items seized from the vehicle on property receipts, including the narcotics, but . . . did not complete a Towing Report describing personal effects left in the vehicle" did "not demonstrate that the officers conducted the inventory search as pretext or in bad faith," and citing *Trullo*); *United States v. Lopez*, 547 F.3d 364, 369-71 (2d Cir. 2008) (rejecting the notion that the constitutionality of an inventory search may turn on whether the inventory form included "an itemization of every object found in the car"); *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998) (rejecting pretext claim where "the officers failed to inventory the items left in the car after the evidence was removed" and despite the fact that "the inventory list started at the scene was not completed as it should have been," where "the seized items were listed on an evidence form later, and there were no other items of value in the car according to the suppression hearing testimony," and citing *Trullo*); *United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir. 1987) (per curiam) (holding that the "failure to compile the written inventory does not render the inventory search invalid," and citing *Trullo*); *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985) ("We also reject O'Bryant's contention that the inventory search exception to the general prohibition against warrantless searches was violated because [the officer] did not prepare a complete list of the briefcase's contents.").

U.S. at 372 (emphasis added). Following *Bertine*, however, the First Circuit has stated that "the law is clear" that "[t]he subjective intent of the officers is not relevant so long as they conduct a search according to standardized inventory policy." *Hawkins*, 279 F.3d at 86; *accord Boudreau*, 901 F.3d at 73. Relatedly, it has also said that an impoundment is not unreasonable merely if the "police may also have an investigatory motive." *Davis*, 909 F.3d at 17; *accord United States v. Sylvester*, 993 F.3d 16, 23-24 (1st Cir. 2021); *Boudreau*, 901 F.3d at 72; *Coccia*, 446 F.3d at 240-41; *Rodriguez-Morales*, 929 F.2d at 787. And it has left room for a pretext exception only where the record discloses that (a) "there was *no non-investigatory reason* to conduct the inventory search," *Rivera*, 988 F.3d at 581 (emphasis added), and (b) "the inventory search was in fact motivated *solely* by an investigatory purpose," *id.* at 582 (emphasis added); *accord Sylvester*, 993 F.3d at 23-24 (asking whether the impound decision was "justified by a legitimate, non-investigatory purpose" and whether "the sole purpose of the impound was investigatory").[3]

Without resolving the question, the First Circuit has strongly suggested the defendant bears the burden of making such a showing, citing decisions of the Ninth and Tenth Circuits in support. *See Sylvester*, 993 F.3d at 24 n.6. No court has held otherwise. Vick cannot carry that burden.

The record does not support a finding that (a) there were "no" non-investigatory reasons for the officers' actions and (b) they acted in "bad faith" for the "sole purpose" of investigating crime. By the time of the impoundment and inventory, the Nissan was on a public street and there were no fewer than three separate reasons why Warner could not drive it. These are classic

---

[3] Only one First Circuit case has faulted an impound decision, *see United States v. Del Rosario*, 968 F.3d 123, 127-29 (1st Cir. 2021), and the First Circuit itself has cabined that opinion: "The Court in *Del Rosario* held that an impound decision was invalid where there was no real objective justification for it pursuant to the officers' community caretaking function, such that the only conclusion was 'that the seizure served no purpose other than facilitating a warrantless investigatory search under the guise of an impoundment inventory.'" *Sylvester*, 993 F.3d at 23 n.5. Moreover, as the *Sylvester* Court observed, *Sylvester*, 993 F.3d at 23, the *Del Rosario* Court itself was careful to note as follows: "To be clear, we are not saying that an improper motive renders the community-caretaking exception inapplicable." *Del Rosario*, 968 F.3d at 128-29.

15

situations in which a car should be impounded under standardized policy. Moreover, once the tow decision was made, inventorying the car's contents followed as a matter of course—in fact, it was required—and it was perfectly legitimate under black letter law. There is no margin for concluding otherwise. The Court's analysis should have ended here.

In ruling against the government on the second prong of this two-part test, the Court relies on seven main grounds, most of which Vick never mentioned: (1) officers asked Vick several times about what car he was driving and about his car keys [ECF 157 at 8-9, 47]; (2) an "officer seems to have said 'once we get in the car . . .' shortly after an unsuccessful plain view search" of the car [ECF 157 at 9-10, 47]; (3) when the officers returned to the barracks and learned for the first time that the car was unregistered, uninsured, had false plates, was possibly stolen, and that Warner was unlicensed, it "strains credulity" to think that they would drive 16.1 miles back to the parking lot (or 32.2 miles roundtrip) "simply so that an unregistered, uninsured vehicle bearing improper license plates could be impounded" [ECF 157 at 47];[4] (4) the officers waited "at least one and a half hours" in the parking lot for Warner to arrive [ECF 157 at 47]; (5) the officers waited until Warner left the lot before stopping him [ECF 157 at 48]; (6) the officers "appeared to dismiss Warner as quickly as possible" [ECF 157 at 48]; and (7) the inventory search began in the trunk and Trooper Dolan first examined the jacket the officers had seen Warner move to the trunk moments before [ECF 157 at 48]. Even assuming the accuracy of these statements, all they tend to show is that the officers had an investigatory motive and perhaps even a strong one. It is quite another thing to say, however, that they had zero concerns about the fact that an unlicensed man was about to drive back to Rhode Island in a car that was unregistered, uninsured, had false plates,

---

[4] The Court here suggests the police had no traffic-related concerns that justified the trip back to the lot, yet it earlier found that Warner's mere act of driving across the lot and onto the street posed safety hazards. If that is so, then surely those risks would have been multiplied many times over by his driving all the way to Rhode Island.

and was possibly stolen. *That* is a proposition that strains credulity. Moreover, under the Court's logic, law enforcement was required either to (a) let Warner proceed with impunity back to Rhode Island, or (b) stop him and possibly impound the car but refrain from conducting an inventory search. This is nonsensical. Regardless, Vick fails the first prong of the test because there were surely non-investigative *reasons* for what the officers did even if one assumes they acted purely with investigative intent. And that alone requires denial of his suppression motion.

The Court's ruling is legally erroneous for an additional reason. At bottom, the Court posits that the traffic stop was merely a pretext for the officers to conduct the subsequent inventory search, focusing in large part on the fact that the officers waited for the car to leave the parking lot before pulling it over on the public street for traffic violations. But the law is settled that—unlike in the impoundment/inventory context—there can be no pretext inquiry at all into such a traffic stop decision. *See Whren*, 517 U.S. at 811-12 (distinguishing impoundment/inventory context from traffic stop context and holding that in the latter an officer's motives are wholly irrelevant); *accord Kentucky v. King*, 563 U.S. 452, 464 (2011) ("[W]e have never held, outside limited contexts such as an 'inventory search or administrative inspection ..., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'") (quoting *Whren*); *Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011) (same); *United States v. Reyes*, 24 F.4th 1, 17 (1st Cir. 2022) ("[A]n officer may use a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime"); *United States v. Miles*, 18 F.4th 76, 79-80 (1st Cir. 2021); *United States v. Cruz-Rivera*, 14 F.4th 32, 44 (1st Cir. 2021); *United States v. Maldonado-Peña*, 4 F.4th 1, 23 (1st Cir. 2021). By questioning the officers' motives during the traffic stop phase of the events that preceded the impoundment and inventory search, the Court committed a further legal error.

A Supreme Court opinion is directly on point. In *Arkansas v. Sullivan*, the Arkansas Supreme Court suppressed evidence found during an inventory search on the ground that officers acted pretextually in arresting the defendant immediately prior to that search, accepting his claim that "his arrest was merely a 'pretext and sham to search' him" by means of the later inventory search. 532 U.S. 769, 770 (2001) (per curiam). Citing *Whren*, the Supreme Court summarily reversed, holding that "the Arkansas Supreme Court's decision on rehearing is flatly contrary to this Court's controlling precedent." *Id.* 771-72. The Court observed: "The Arkansas Supreme Court's holding . . . cannot be squared with our decision in *Whren*, in which we noted our 'unwilling[ness] to entertain Fourth Amendment challenges based on the actual motivations of individual officers,' and held unanimously that '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *Id.*

So too here. The record does not support a finding that the officers waited for Warner to drive onto the public street and then pulled him over for the traffic violations "solely" because they wished to conduct a later inventory search. But even if there *were* support for such a determination, that would be immaterial under the precedents cited above. The ensuing traffic stop was justified by three separate traffic infractions and Vick has never contested it. The impound decision was also justified for three separate reasons noted in TRF-09—three paradigmatic situations where an impound is proper. And as discussed above, the First Circuit has said that "[o]nce a car is impounded, an inventory search follows as a matter of course in prudent law enforcement practice, if for no other reason than to make a record to protect the police against a later claim that custodial negligence allowed the loss of valuable property by theft or otherwise." *Jaynes*, 824 F.3d at 197. That the officers hoped or even expected a search might yield evidence of crime—that they may have even harbored strong investigatory motives—is of no moment. *See Sylvester*, 993 F.3d at 23-

24; *Davis*, 909 F.3d at 17; *Boudreau*, 901 F.3d at 72; *Coccia*, 446 F.3d at 240-41; *Hawkins*, 279 F.3d at 86; *Rodriguez-Morales*, 929 F.2d at 787. The notion that this was their *sole* motive and that there were *no* non-investigatory reasons for what they did is groundless.

## Conclusion

The government respectfully submits that the order granting suppression of the gun found in the Nissan is "clearly unjust" and based on "manifest error[s] of law" that merit reconsideration. *See United States v. Cintron*, 724 F.3d 32, 36 n.5 (1st Cir. 2013); *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009). Reconsideration is all the more critical here because suppression is a remedy of "last resort" that imposes "substantial social costs," *Utah v. Strieff*, 579 U.S. 232, 237-38 (2016) (cleaned up), including in this case the potential termination of a firearms prosecution of a dangerous repeat offender.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    */s/ Donald C. Lockhart*
Donald C. Lockhart
Kristen M. Noto
Brendan O'Shea
Assistant U.S. Attorneys
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing system.

*/s/ Donald C. Lockhart*
Donald C. Lockhart
Assistant U.S. Attorney

Dated:  July 12, 2024

19