# United States Court of Appeals
## For the First Circuit

---

No. 24-1721

UNITED STATES OF AMERICA,

Appellant,

v.

CHARLIE D. VICK,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Margaret R. Guzman, U.S. District Judge]

---

Before

Barron, Chief Judge,
Gelpí and Rikelman, Circuit Judges.

---

Donald C. Lockhart, Assistant U.S. Attorney, with whom Joshua S. Levy, Acting United States Attorney, and Leah B. Foley, United States Attorney, were on brief, for appellant.

Richard J. Farrell, Jr., with whom Farrell Fernandez, P.C. was on brief, for appellee.

---

July 30, 2025

---

**RIKELMAN**, <u>**Circuit Judge**</u>.    This case concerns the community caretaking exception to the Fourth Amendment's warrant and probable cause requirements.  In February 2023, police officers arrested Charlie Vick in a parking lot for domestic assault and battery involving a firearm.  Shortly after his arrest, the officers learned that the car that he had been driving, which remained in the lot, was uninsured, unregistered, and had invalid license plates.  They then waited until Vick's uncle attempted to drive away the car and stopped him almost immediately after he exited the parking lot.  Following the stop, the officers impounded the car and conducted an inventory search before it was towed. The search turned up a gun, leading to Vick's federal charge for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  The district court concluded that the officers had staged the impounding and that their "sole" motive for the search was investigatory.  It thus ruled that the evidence found during the search -- the gun -- had to be suppressed.

The government appeals, arguing that the district court should not have considered the subjective motives of the officers, but that, regardless, the court's "sole" motive finding was clearly erroneous.  We agree with the government on this last point and thus reverse the district court's grant of the motion to suppress.

## I. BACKGROUND

### A. Relevant Facts

On February 21, 2023, Rhode Island police officers enlisted the help of the Massachusetts State Police (MSP) violent fugitive apprehension team to execute an arrest warrant against Vick. During the briefing on the case, the MSP officers learned that Vick had been charged with domestic assault and battery because he had allegedly poured bleach on and pointed a loaded gun at his girlfriend. They also learned that the gun had not yet been recovered. And, at least one of the MSP officers who was assigned to the arrest knew that Vick had a criminal history, including previous convictions for possession of firearms and/or ammunition.

Shortly before 7:00 a.m., the apprehension team arrived at Vick's workplace, a Kitchen & Bath store in Uxbridge, Massachusetts. The officers observed Vick drive into the parking lot in a blue Nissan Altima. Vick remained in the car for about fifteen minutes. When he emerged, officers informed him that there was a warrant out for his arrest and placed him in handcuffs. The arrest was recorded by one of the officer's body cams.

After his arrest, Vick convinced the officers to allow him to leave his belongings, specifically his keys and a knife he was carrying, with his employer. He also requested that his uncle, Jamie Warner, who Vick claimed owned the Altima, be permitted to

retrieve the car and Vick's personal belongings.  While Vick remained in handcuffs in the parking lot, one of the officers, Trooper Dolan, conducted a plain view search of the Altima and observed a black jacket laying on the back seat.  He did not see any contraband in the vehicle.

Soon after, the other officers drove Vick back to the MSP barracks in Millbury, Massachusetts, about 20 minutes away from the Kitchen & Bath.  There, Trooper Dolan learned that the Altima was unregistered, uninsured, and had the incorrect license plates.  As a result, the car could not be legally driven.

Troopers Dolan and Andrews then returned to the Kitchen & Bath to surveil the Altima.  The officers stationed their undercover cruisers on opposite ends of the parking lot.  Around that time, they were informed that Warner was en route to pick up the Altima and that he did not have a valid driver's license.  They also received a verbal description of Warner.

About an hour and a half later, another car pulled into the lot, and a man matching Warner's description exited the car and entered the Kitchen & Bath.  Eventually, that man (who was in fact Warner) re-emerged and approached the parked Altima.  Warner opened the back door, removed the black jacket, and stuffed the jacket into an unzipped backpack that was in the trunk.  He and a young boy (who turned out to be his son) then began driving out of the parking lot in the Altima.

The officers followed Warner out of the parking lot and onto a public road, where they pulled him over less than a mile away from the Kitchen & Bath.  Trooper Andrews then spoke with Warner, who acknowledged that his license was suspended.  In response to the officers' questions, Warner attested that the Altima belonged to his girlfriend.  Trooper Andrews issued Warner a summons for driving without a license and told him he was free to leave.  The officers then called for a tow truck to impound the Altima.  The officers did not ask Warner if some other individual was available to drive the car.  They also did not ask Warner if he had a preferred towing company.  Warner did not request to remove any items from the Altima before he departed, but he did take his cell phone with him.

The officers, who were by that point joined by Sergeant Martinez, then began to search the Altima.  The search was recorded by Trooper Dolan's body cam.  Each officer started the search at a different part of the car.  Trooper Dolan went straight to the trunk, which was unlocked.  He immediately extracted the unzipped backpack, retrieved the black jacket from inside, and discovered a loaded gun wrapped in the jacket.  The officers then paused the search while they attempted to track down Warner, who by then had left the scene with his son.  Eventually, Sergeant Martinez completed the inventory search and filled out an inventory form on the contents of the Altima.  The inventory form listed 13 items

recovered from the vehicle: "black 9MM pistol (Glock) with serial number AFKE373," "Men's black coat," "Jumper Cables," "Red Backpack," "Orange extension cords," "Black/White wind breaker," "Battery Charger," "Black hoodie," "Empty gas can," "Socket Set (Tools)," "Speaker Box with Amp," "Computer Speakers," and "Portable air compressor."

## B. Relevant MSP Policies

In impounding the Altima and conducting the subsequent search, the officers were required to follow MSP policies. Two department policies are at issue in this case.

First, MSP TRF-09 (the "Towing Policy"), describes when officers may impound a vehicle. It begins by stating: "Public safety is the Department's primary concern and shall guide the application of this policy. . . . [M]embers shall remove such vehicles to a location which shall ensure the safety and well-being of the occupants, security of the vehicle, and allow for safe and efficient flow of traffic." It also emphasizes that "[p]ublic safety is of paramount importance when considering the time, manner, and method of off-loading and/or towing a large vehicle."

The Towing Policy provides for several "[c]auses for [r]emoval" of a vehicle. In particular, officers may remove a "vehicle found upon any way . . . [n]ot validly registered or insured in violation of law." Further, officers may remove a vehicle from "any way" when the "operator" is "[n]ot properly

licensed."   Officers  are  authorized  to  remove  a  vehicle  from
private property only when the vehicle is on the property "without
the consent of the property owner."

        The    Towing    Policy    also    sets    forth    the
"[r]esponsibilities of the [officer] [t]owing a [v]ehicle."  These
include that the officer "shall inquire": (1) "whether the owner
or authorized driver can direct the [officer] to dispose of the
vehicle in some lawful and reasonable manner," and (2) "if there
is a preference for a particular tow company or roadside service
organization."   Finally,  the  policy  states  that  "[w]hen
applicable,  [officers]  shall  inventory  the  towed  vehicle  in
accordance with TRF-10 Vehicle Inventory."

        The second policy, TRF-10 (the "Inventory Policy"), sets
out  mandatory  procedures  for  officers  conducting  an  inventory
search of an impounded vehicle.  It provides that "[a]ny vehicle
towed . . . shall be inventoried and properly documented in order
to protect: [t]he vehicle and its contents; [t]he Department . . .
against false claims of lost, stolen, or vandalized property; and
[t]he [officers] and the public from dangerous items that might be
in the vehicle."[1]

---

        [1] The Inventory Policy also lays out several circumstances in
which officers can decide not to inventory a vehicle.  Vick does
not argue that any of those circumstances were applicable here.

The Inventory Policy also sets forth the "Inventory Procedure."  It states in full:

> The standard inventory procedure shall consist of a detailed inspection of the interior and exterior of the vehicle for damaged and missing parts, as well as to locate and record the contents of the vehicle.  The following areas shall be inventoried:
> - The interior of the vehicle;
> - The glove compartment and trunk (unless they are locked and there is no key available); and
> - The exterior of the vehicle for missing or damaged parts.
>
> The inventory listing of personal items and valuables shall extend to all storage areas and compartments that are accessible to the operator or occupants.  This encompasses:
> - All open areas, including the floor areas, the area in and around the instrument panel and the rear deck above the rear passenger seat, the open area under the seats, the glove compartment and trunk, and other places where property may be kept.
>
> All closed but unlocked containers shall be opened, and each article inventoried individually.
>
> Locked containers shall be inventoried as a single unit.
>
> If an owner and/or operator requests to remove or entrust their possessions to another person, without it impeding the towing or impoundment process, such request may be granted, unless the [officer] has probable cause to seize the items.

Officers are required to "[a]ccurately record on the motor vehicle inventory form a complete listing of the general condition of the vehicle and its contents."

### C. Legal Proceedings

A grand jury indicted Vick in April 2023 on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  The case proceeded to trial, but the jury deadlocked and the court declared a mistrial.  Vick did not file any motions to suppress in that original criminal proceeding.

In March 2024, Vick was charged in a superseding indictment with one count of violating 18 U.S.C. § 922(g)(1), and, for the first time, one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(1).  Vick then moved to suppress the evidence seized during the search of the Altima.

The district court held an evidentiary hearing on Vick's motion to suppress.  Troopers Dolan and Andrews both testified. As part of his testimony, Trooper Dolan explained that, to the best of his understanding, the Towing Policy would not have permitted the officers to tow the Altima while it was still in the Kitchen & Bath parking lot.  Thus, he and Trooper Andrews waited at the Kitchen & Bath to "mak[e] sure the car was removed safely from the parking lot and didn't break the law."  When defense counsel asked Trooper Dolan whether he "allowed the car to leave

[the lot] under unsafe conditions," he responded: "We didn't make [Warner] get in the car.  We didn't make him drive it without a license.  We didn't make him operate an unregistered, uninsured vehicle with attached plates. . . . We could have stopped him, but that's not our job."  Trooper Andrews corroborated Trooper Dolan's account of Vick's arrest, as well as the impounding and search of the Altima.

In a detailed opinion, the district court ultimately granted Vick's motion to suppress.  In evaluating the constitutionality of the officers' actions, the court considered the statements of both witnesses, the officers' body cam video footage of the arrest and search, and the two MSP policies.  It then concluded that the officers materially deviated from the policies in several ways, and that these deviations opened the door to an inquiry about the officers' subjective intent in deciding to impound the Altima and conduct the subsequent search. Assessing the "constellation" of facts surrounding the search, the court found that the officers' "sole motivation" in impounding and inventorying the Altima was investigatory.  Thus, it concluded that the search violated Vick's Fourth Amendment rights.

## II. STANDARD OF REVIEW

"On review of a district court's order granting a motion to suppress, we apply a 'mixed standard,' reviewing 'findings of fact and credibility determinations . . . for clear error and . . .

conclusions of law de novo.'" <u>United States</u> v. <u>Rivera</u>, 988 F.3d
579, 581 (1st Cir. 2021) (alterations in original) (emphasis
omitted) (quoting <u>United States</u> v. <u>Dubose</u>, 579 F.3d 117, 120 (1st
Cir. 2009)).  "We view the facts in the light most favorable to
the district court's ruling, but only to the extent they are not
clearly erroneous."  <u>Id.</u>

### III. DISCUSSION

        As a general matter, "the decision to impound [a vehicle]
(the 'seizure') is properly analyzed as distinct from the decision
to inventory [a vehicle] (the 'search')." <u>United States</u> v. <u>Duguay</u>,
93 F.3d 346, 351 (7th Cir. 1996).  Proceeding logically, we begin
our analysis with the officers' decision to impound the Altima, as
it led directly to the subsequent search.  And, consistent with a
concession by Vick before the district court, we determine that
the officers had an objectively reasonable basis for impounding
the Altima.  Viewing the record as a whole, we also conclude that
the district court clearly erred in finding that the officers'
"sole motivation" for impounding the car was investigatory.  We
then consider the inventory search and hold that, regardless of
whether the search deviated from the Inventory Policy, the district
court's "sole motivation" finding was clearly erroneous on this
score as well.

### A. The Decision to Impound

As far as we can tell, Vick focuses on the officers' conduct before the inventory search -- including their decision to impound the Altima -- because he views that earlier conduct as probative of the officers' subjective motives during the later inventory search. In particular, Vick emphasizes the purported unreasonableness of impounding the car. To the extent that Vick also advances a direct challenge to the officers' impound decision, we reject that challenge. As we will explain, the record does not support his contention that the officers were motivated solely by an investigative purpose in impounding the Altima.

Decisions to impound are governed by the "community caretaking" exception to the Fourth Amendment's warrant and probable cause requirements. Cady v. Dombrowski, 413 U.S. 433, 441-43 (1973). "[T]he community caretaking function encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience." United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006) (citing South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976)). "Pursuant to that exception, an impound decision is constitutionally valid so long as it is reasonable under the totality of the circumstances." United States v. Sylvester, 993 F.3d 16, 23 (1st Cir. 2021).

We highlight two points from our precedent that bear on our analysis of the officers' impound decision. First, we have

held that "[t]he presence of <u>both</u> investigatory and community caretaking motives does not render unlawful an objectively reasonable decision to impound." <u>Id.</u> at 24 (emphasis added); <u>see, e.g.,</u> <u>United States</u> v. <u>Del Rosario</u>, 968 F.3d 123, 128 (1st Cir. 2020) (noting that the community caretaking exception "might well apply" even in cases where officers "seized [a] car so that they could search it for evidence of a crime").

Second, we have underscored the importance of officer discretion in deciding when to impound a vehicle, given the variety of situations officers can encounter in the field. <u>See</u> <u>United States</u> v. <u>Davis</u>, 909 F.3d 9, 17 (1st Cir. 2018) ("The standard for vehicle impoundments explicitly contemplates room for police discretion based on the circumstances."). That is because "[v]irtually by definition, the need for police to function as community caretakers arises fortuitously, when unexpected circumstances present some transient hazard which must be dealt with on the spot." <u>Coccia</u>, 446 F.3d at 239 (quoting <u>United States</u> v. <u>Rodriguez-Morales</u>, 929 F.2d 780, 787 (1st Cir. 1991)). Thus, "officers [are] not constitutionally required to select the least intrusive" -- or most optimal -- "way of fulfilling their community caretaking responsibilities." <u>Sylvester</u>, 993 F.3d at 24 (internal quotation marks and citation omitted).

From the record below, it does not appear that Vick ever requested a ruling on the objective reasonableness of the decision

to impound. So, the district court proceeded straight to an assessment of the officers' subjective motives for that decision and concluded that their "sole motivation" was investigatory. On appeal, the government contends that there was an objectively reasonable basis under the community caretaking exception to impound the Altima, and thus the court was foreclosed from inquiring into the officers' subjective intent. It also argues, in the alternative, that there is no basis in the record for a "sole" motive finding, given that the officers in fact were responding to circumstances that they knew made the Altima a safety hazard. According to the government, even a "strong" investigatory motive is legally irrelevant so long as the officers were also trying to fulfill their community caretaking role.

### 1. Objective Reasonableness

We agree with the government that we must start by determining whether there was an objectively reasonable basis for the officers' decision to impound the Altima.[2] Here, that issue

---

[2] The district court determined that Vick had Fourth Amendment "standing" to challenge the inventory search but not the traffic stop. The court did not evaluate, however, Vick's standing to challenge the decision to impound. But because Fourth Amendment "standing" is not jurisdictional, we may assume that Vick could challenge the decision to impound, and we will consider his arguments defending the district court's ruling on the merits. See United States v. Lyle, 919 F.3d 716, 730-31 (2d Cir. 2019) (addressing defendant's Fourth Amendment challenge to rental car impoundment despite concluding he lacked Fourth Amendment "standing" because he did not have a reasonable expectation of privacy in the vehicle).

is not in dispute: Before the district court, Vick conceded that the officers' decision to impound was reasonable.[3]  We hold him to that concession on appeal.  See Baker v. Smith & Wesson, Inc., 40 F.4th 43, 45 n.1 (1st Cir. 2022) ("[A] party cannot concede an issue in the district court and later, on appeal, attempt to repudiate that concession and resurrect the issue." (alteration in original) (quoting United States v. Miranda-Carmona, 999 F.3d 762, 767 (1st Cir. 2021))).

Nevertheless, we take a moment to explain why the parties do not dispute that the officers' impound decision was reasonable based on the record here.  As the record reflects, the Altima was unregistered, uninsured, and had the wrong plates.  These are exactly the types of facts that implicate vehicle-related safety concerns under the community caretaking exception.  See Del Rosario, 968 F.3d at 127.[4]  And, the Towing Policy expressly

---

[3] We presume that the district court did not evaluate objective reasonableness because of Vick's concession.

[4] In Del Rosario, we highlighted several situations that may justify an officer's decision to impound:

> (1) a rental company owned the car; (2) the car could not legally be driven; (3) the potential presence of dangerous materials in the vehicle; (4) the car was on the property of another; (5) the defendant would be indisposed for a long time; (6) the car was packed full of personal property that might be stolen; (7) the car was in an area known for criminal activity; (8) there was no one else immediately available to take the vehicle; and

provides that vehicles like the Altima, which are unregistered or uninsured and found on "any way," should be impounded.  See Coccia, 446 F.3d at 238-39 ("[A]n impoundment decision made pursuant to standardized procedures will most likely, though not necessarily always, satisfy the Fourth Amendment.").  Vick does not argue to the contrary.

Further, it is undisputed that the officers believed that the Towing Policy did not permit them to impound the Altima in the Kitchen & Bath parking lot, given that the lot was private property and the owner had not consented to have the Altima removed.[5]  Thus, the record here indicates that, under the officers' subjective understanding of Massachusetts law, the only option available to them for exercising their community caretaking function -- securing the Altima -- was to allow Warner to drive the car off the parking lot and then impound it once he was on a

---

> (9) the car was parked illegally or dangerously and might be best not left behind.

968 F.3d at 127 (internal citations omitted).

[5] The government cautions that we should not decide whether, as a matter of Massachusetts law, the officers were correct.  We agree that we need not reach the issue given that Vick does not dispute that the officers in fact had this understanding, nor did the district court doubt their testimony on this point.  We also note that body cam footage from one of the officers in the Kitchen & Bath parking lot reveals the officer stating:  "I think the owner is gonna want it out of here so we can tow it."  But there is no evidence that the Kitchen & Bath owner ever requested or otherwise consented to the car's removal from the lot.

public road.  See Rodriguez-Morales, 929 F.2d at 786; cf. Coccia,
446 F.3d at 240 (explaining that the fact that "there was no
obvious alternative means for removing the car" was relevant to
the reasonableness of the impound decision).

### 2. Sole Motive

We turn next to the government's contention that,
because the officers had an objectively reasonable basis to impound
the Altima, the district court should not have inquired into their
subjective intent for doing so.  For the purposes of this appeal,
we assume arguendo that an inquiry into the officers' subjective
intent was legally appropriate.  See 3 Wayne LaFave, Search and
Seizure: A Treatise on the Fourth Amendment § 7.5(e) (6th ed. 2024)
("The pretextual nature of an otherwise lawful stop or arrest . . .
cannot be used to challenge that seizure," but may be evidence of
the "pretextual/unconstitutional nature of a vehicle inventory
search conducted thereafter."); see also United States v. Johnson,
889 F.3d 1120, 1125-26 (9th Cir. 2018) (conducting pretext inquiry
based on the facts related to the impound decision).

We thus proceed to the district court's "sole
motivation" factual finding, which the government has conceded we
should review for clear error in this case.  In making this
finding, the court was understandably concerned about the
officers' decision to permit an unlicensed individual to drive an
unregistered, uninsured car on a highway, with a young child on

board, even if only for a short distance. The court viewed this decision as inconsistent with the overarching purpose of the Towing Policy: public safety. The court also noted that the officers violated several other aspects of the Towing Policy. In its view, those actions, collectively, undermined any claim that the officers were motivated by non-investigatory concerns.

But even applying clear-error review, we must conclude that the record as a whole cannot support the "sole motivation" finding, at least as our precedent has defined "sole." As we have stressed, a decision to impound is lawful, even if officers have an investigatory motive, so long as they are <u>also</u> acting to fulfill their community caretaking role. See <u>Sylvester</u>, 993 F.3d at 24 ("The presence of both investigatory and community caretaking motives does not render unlawful an objectively reasonable decision to impound."). The district court was undoubtedly correct in concluding that the officers had an investigatory motive that morning. But officers are not legally required to be motivated <u>exclusively</u> by a non-investigatory purpose in deciding to impound a vehicle.

Here, it is undisputed that, at the time the officers decided to impound the Altima, they knew the key facts that made the car subject to impoundment under the community caretaking exception. To recap, those facts were that the Altima was unregistered and uninsured, with invalid plates, and thus posed a

safety risk because it could not be legally driven. It is also undisputed that the officers were acting upon those facts. At the hearing, the officers testified that their goal was to "mak[e] sure the car was removed safely from the parking lot and didn't break the law." And the district court made no factual finding that the officers' testimony was not credible on that point. Although the court did emphasize the significance of the officers' investigatory motives, it offered no basis for concluding that the officers had no subjective motivation to prevent an unlicensed driver from taking an unregistered, uninsured vehicle with invalid plates across state lines. Thus, the record compels a conclusion that the officers were not "solely" motivated by an investigatory purpose.

We also disagree as a legal matter with the district court's conclusion that the deviations from the Towing Policy -- namely, the officers' failures to ask Warner about the availability of a third-party driver to remove the Altima, and relatedly, if he had a preferred towing company -- could support a sole motive finding on the record here. To start, it would have been pointless to ask Warner about the availability of a third-party driver, because no individual could have lawfully operated the Altima. Cf. United States v. Cartwright, 630 F.3d 610, 616 (7th Cir. 2010) (rejecting challenge to reasonableness of impound decision on similar grounds). So, this deviation from the

policy does not support a finding that the officers' "sole motivation" was investigatory.

That leaves the officers' failure to ask Warner about his preferred towing company. To be sure, the Towing Policy requires officers to pose this question. At the same time, the Towing Policy grants officers discretion to reject a driver's preferred method of removing a vehicle. For instance, officers may look to various factors such as "[w]eather conditions," "traffic conditions [that may] require immediate removal," and the "expediency" of the situation to decide whether the driver's preference is reasonable. Thus, although the officers did not ask Warner about his preferred towing company, the plain text of the policy granted them discretion whether to respect any such preference, including based on the then-current "traffic conditions" on the road. And, we have noted that, as a general matter, "[s]tandard protocols have limited utility in circumscribing police discretion in the impoundment context because of the numerous and varied circumstances in which impoundment decisions must be made." Sylvester, 993 F.3d at 23 (quoting Coccia, 446 F.3d at 239). That is true even "where, as here, the impoundment was followed by an inventory search." Coccia, 446 F.3d at 239 (citing Rodriguez-Morales, 929 F.3d at 787 n.3). As a result, on these facts, we conclude that the failure to ask Warner about his preferred towing company could not support

a finding, consistent with our case law, that the officers' "sole" motive was investigatory.

Finally, in defense of the district court's "sole motivation" finding, Vick points to Del Rosario to argue that the officers clearly "manufactured" a post-hoc, safety-based rationale for their decision to impound.[6]  But Del Rosario is clearly distinguishable.  There were no facts in the record of that case that objectively could have "justif[ied] application of the [community caretaking] exception."  Del Rosario, 968 F.3d at 127. The defendant's car was validly registered and insured, legally parked on a residential street, and did not contain any visible personal property, let alone contraband.  See id. at 127-28.  Thus, we concluded that the officers' invocation of the community caretaking exception to impound the car was clearly "a subterfuge" for an investigatory search.  Id. at 129; see also Sylvester, 993 F.3d at 23 n.5 ("The Court in Del Rosario held that an impound decision was invalid where there was no real objective justification for it pursuant to the officers' community caretaking function, such that the only conclusion was 'that the seizure served no purpose other than facilitating a warrantless investigatory search under the guise of an impoundment

_____

[6] We set aside the fact that, as the officers pointed out at the evidentiary hearing, they did not "manufacture" the circumstances that rendered the Altima undriveable, nor did they summon Warner to the parking lot.

inventory.'" (emphasis added) (quoting <u>Del Rosario</u>, 968 F.3d at 127-28)).

Here, by contrast, Vick conceded that the officers had an objectively reasonable basis to impound the Altima. Indeed, this case presents many of the exact facts that the <u>Del Rosario</u> court highlighted could justify the decision to impound a vehicle: The Altima was unregistered, uninsured, had the incorrect license plates, and could not be legally driven by anyone. Thus, <u>Del Rosario</u> does not help Vick.[7]

To sum up, the undisputed facts demonstrate that the officers had a valid, non-investigatory basis to impound the Altima. And there is no evidence in the record that the officers were not actually motivated by that community caretaking concern. To the contrary, the officers testified at the evidentiary hearing that their primary aim was to safely secure the inoperable vehicle. Although the record amply supports the district court's finding that the officers also had a strong, investigatory motive for their actions, our precedent is clear that an investigatory motive does

---

[7] To the extent the government argues that the district court erred by considering the officers' conduct before they impounded the car as evidence of the officers' subjective motives during the inventory search, we disagree. <u>See</u> <u>Rodriguez-Morales</u>, 929 F.2d at 785 ("[T]o find whether the removal of a defendant's car . . . was within the troopers' community caretaking function, 'we are obliged to look at all the facts and circumstances of the case in light of the principles set forth in [prior] decisions.'" (quoting <u>Opperman</u>, 428 U.S. at 375)).

not erase or render legally irrelevant the officers' community caretaking motives.  Thus, we must conclude that the district court's finding that the officers "sole motivation" was investigatory was clearly erroneous, and the impound decision was therefore lawful.  See Coccia, 446 F.3d at 241.

### B. The Inventory Search

We now turn to the inventory search.  "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage."  Whren v. United States, 517 U.S. 806, 811 n.1 (1996).  Usually, when a car is impounded, an inventory search follows "as a matter of course."  Jaynes v. Mitchell, 824 F.3d 187, 197 (1st Cir. 2016).  Nevertheless, "[t]he validity of an impoundment is not dispositive of the validity of an inventory search."  United States v. Taylor, 636 F.3d 461, 465 (8th Cir. 2011); cf. Boudreau v. Lussier, 901 F.3d 65, 72-73 (1st Cir. 2018).

The community caretaking exception also applies to an inventory search.  See Colorado v. Bertine, 479 U.S. 367, 371 (1987); see also Rivera, 988 F.3d at 582 ("It is clear that an inventory search carried out to serve th[e] purposes [of the MSP Inventory Policy] could be compliant with the Fourth Amendment (even though done warrantlessly and without probable cause) . . . .").  To prevent the exception from swallowing the

warrant requirement, however, the U.S. Supreme Court has made clear that officers must conduct inventory searches consistent with established procedures for the exception to apply.  See Opperman, 428 U.S. at 375-76; see also Rodriguez-Morales, 929 F.2d at 787 n.3 ("[I]n the context of inventory searches, the [Supreme] Court has concluded that searching is reasonable only if performed according to standardized procedures.").  Such procedures "tend[] to ensure that the intrusion w[ill] be limited in scope to the extent necessary to carry out the caretaking function." Opperman, 428 U.S. at 375.  Thus, "[t]he requirement of standardized procedures serves to remove the inference that the police have used inventory searches as 'a purposeful and general means of discovering evidence of crime.'" United States v. Marshall, 986 F.2d 1171, 1175 (8th Cir. 1993) (quoting Bertine, 479 U.S. at 376 (Blackmun, J., concurring)).  "The [g]overnment bears the burden of showing that its conduct complied with the inventory search exception to the warrant requirement." Taylor, 636 F.3d at 464.

Unlike many other areas of Fourth Amendment law, courts can inquire into the subjective intent of law enforcement officers in the inventory search context, at least in certain circumstances. That is because the Supreme Court's inventory search precedent expressly requires that officers act "in good faith," Bertine, 479 U.S. at 374, and not as part of a "ruse" to investigate, Florida v. Wells, 495 U.S. 1, 4 (1990).  In particular, we have explained

that officers' deviation from a standardized inventory search policy calls into question whether they were acting in their community caretaking role or for an impermissible, solely investigatory purpose.  See, e.g., United States v. Hawkins, 279 F.3d 83, 86 (1st Cir. 2002) ("The subjective intent of the officers is not relevant so long as they conduct a search according to a standardized inventory policy.").

       The district court found that the officers deviated from the Inventory Policy, both by insufficiently describing the items seized from the Altima and by failing entirely to recount the car's "general condition," as the policy expressly requires.  It further concluded that these violations were "material," thus permitting an inquiry into the officers' subjective intent.  Like the district court, Vick and the government adopt the view that any deviations from an inventory search policy must be "material" to open the door to a pretext inquiry.  See United States v. Anderson, 101 F.4th 586, 596 (9th Cir. 2024) (applying "material deviation" standard).  We have not yet determined what makes a deviation from an inventory policy "material" such that a pretext inquiry is legally permissible or even against what standard we must evaluate

if such a deviation is material.  We conclude, however, that we need not resolve that open question in this case.[8]

Here, even assuming that the officers deviated from the Inventory Policy in a material way such that the district court could consider their subjective intent, we must again conclude that the court's "sole motivation" finding was clearly erroneous. The officers undisputedly had a community caretaking reason for conducting the inventory search: It followed "as a matter of course" from the impound decision (indeed, they were required by the Inventory Policy to undertake the inventory search once they impounded the car).  Jaynes, 824 F.3d at 197.  And, as we have already explained, the officers' predicate decision to impound the Altima was also supported by a valid community caretaking concern. See Rivera, 988 F.3d at 582-83.

Thus, although the record amply supports the district court's finding that the officers appeared to be acting with a strong investigatory purpose, we cannot conclude that investigation of a crime was their sole purpose.  Cf. Bertine, 479 U.S. at 372 (the reasonableness of warrantless inventory search depends on presence of non-investigatory purpose).  It follows

---

[8] To the extent that a "material deviation" could be a per se violation of the Fourth Amendment, rather than simply the basis to inquire into subjective intent, we do not read the district court to have made such a ruling.  Nor do we take Vick to be making such an argument on appeal in defense of the district court's decision.

that, like the decision to impound, the officers' subsequent
inventory search of the Altima complied with the Fourth Amendment.

### IV. CONCLUSION

For all these reasons, we **reverse** the district court's
grant of Vick's motion to suppress and **remand** for further
proceedings consistent with this opinion.